UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No.: 1:21-cv-10117-WGY

TARYN CAMARA,

    Plaintiff,

    v.

CITY OF FALL RIVER, by and through its
Treasurer, Ian P. Schachne, FALL RIVER
PUBLIC SCHOOLS, by and through its
Superintendent, Maria Pontes, MATTHEW H.
MALONE, and MICHAEL SUPLEE,

    Defendants

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, the Defendants, City of Fall River, Fall River Public Schools and Matthew H. Malone submit this Statement of Undisputed Material Facts in Support of Summary Judgment:[1]

1.    The Plaintiff, a public-school teacher, made a comment on Facebook that went viral:

> **"There is one supreme race and gender and that is the white man-I also can't help but notice that race and gender were the ones leading most of the riots! Lastly if you look at the stats more black men have died from other black men than white men-so there lies two problems! But there are far more in equalities that will never**

---

[1] These facts are deemed undisputed only for the purposes of the Defendants' Motion for Summary Judgment.

change!" Document 27 - (Second) Amended Verified Complaint ("AC"), ¶ 55; Exhibit 3 – Notice of Termination, p. 1 (bold in original).

2.      Taryn Camara ("Plaintiff") was a teacher employed by the City of Fall River Public Schools at the Matthew J. Kuss Middle School. **AC, ¶¶ 1, 11; Exhibit 1 – Plaintiff's deposition, pp. 10-11.**

3.      The Core values of the Fall River Public Schools as expressed in its Mission Statement is to be "committed to educating in a respectful, safe and supportive environment," to "strive for inclusiveness," and to "prohibit discrimination of any kind." **Exhibit 2 – Mission Statement – Fall River Public Schools.**

4.      The Plaintiff was "Facebook friends" with fellow teachers at the middle school where she worked. AC, ¶ 30.

5.      The Plaintiff posted under the names "Taryn Lopes Camara" and "Lopez Taz." AC, ¶ 37.

6.      On May 25, 2020, George Floyd was murdered; following his death, protests and civil unrest ensued in Fall River and throughout the nation. AC, ¶ 38; **Exhibit 11 – Arbitration testimony of Matthew Malone, pp. 520-521.**

7.      On Friday, June 5, 2020, at 9:16 a.m., the Plaintiff posted a video of someone commenting about problems with the black community: the breakdown of family, absent fathers, and poverty. **Exhibit 12 – Arbitration testimony of Taryn Camara**, pp. 609-610, 612.

8.      The Plaintiff posted the video with the comment that read, "Confession: I DO NOT support George Floyd and I refuse to see him as a martyr. But I hope his family receives justice." AC, ¶¶ 45-47.

9. In the video posted by the Plaintiff, the commentator argues that "black men killing other black men and the absence of fathers in young black men's lives are more significant problems than police brutality and that she believes that the Black Lives Matter movement (the "BLM Movement") was taking the focus away from these two issues as well as other problems withing the black community." AC, ⨿ 46.

10. The Plaintiff was sharing the message that "to help the black community – we also have to look at the fact that the black-on-black crime is what's killing a lot of black, and we need to educate them so that their community isn't losing fathers, and that's where the breakdown of family is happening." **Exhibit 12, p. 623.**

11. After the Plaintiff shared the video and comment on her Facebook page, people commented on the video, and the Plaintiff responded. AC, ⨿⨿ 51-52.

12. The Plaintiff then engaged in a Facebook discussion with, among others, fellow Kuss Middle School teachers Michael Thornton and Keith Michon, Jr. AC, ⨿ 52; **Exhibit 3(A)(1-5).**

13. Mr. Michon told the Plaintiff that the video she posted promotes a "white supremist narrative." AC, ⨿ 52.

14. Mr. Michon responded to the Plaintiff, "This is not the time to be blaming the black community. Very insensitive post and offers no benefit to the community." **Exhibit 3, (A) (2).**

15. After a comment about race by another Facebook user, the Plaintiff commented:

> "There is one supreme race and gender and that is the white man-I also can't help but notice that race and gender were the ones leading most of the riots! Lastly if you look at the stats more black men have died from other black men than white men-so there lies two problems! But there are far more in equalities that will never change!" AC, ⨿ 55; Exhibit 3, p. 1; (A) (3); (G); **Exhibit 4 – Repost of**

> Plaintiff's Facebook page and comment (hereinafter "one supreme race" comment).

16.     The racial makeup at the Kuss Middle School was approximately 50% white and 50% other races. **Exhibit 1, p. 57**.

17.     The population of the School District is 51% non-white, and the white population is just under 49%. **Exhibit 9 – Arbitration testimony of Thomas Coogan, p. 30**; **Exhibit 11, p. 524.**

18.     A screenshot of the Plaintiff's "one supreme race" comment began being shared on Facebook and went "viral." AC, ¶¶ 73-79, 85; **Exhibit 1, p. 137.**

19.     The Plaintiff's comment was posted on the media website/newspaper Fall River Reporter. **Exhibit 1, p. 147.**

20.     The Plaintiff's "one supreme race" comment "hit the newspaper" on June 8, 2020. **Exhibit 12, p. 648.**

21.     By Monday morning, June 8, the issue of the Plaintiff's statement had publicly "grown more and more since Friday night." **Exhibit 12, p. 655.**

22.     Erica Scott (a then candidate for mayor) also reposted the Plaintiff's comment. **Exhibit 1, p. 147.**

23.     The Plaintiff's "one supreme race" Facebook comment was publicly shared in a post by Michael Suplee, in which he identified her as a special education teacher for the Fall River Public Schools. AC, ¶ 112; **Exhibit 4; Exhibit 1, pp. 53-54, 58; Exhibit 3 (G) (1).**

24.     Supplee posted, "Disgusting and apparently a special ed teacher in Fall River." **Exhibit 1, pp. 53-54, 58; Exhibit 4.**

25.     Suplee found the Plaintiff's comment to be racist. **Exhibit 1, p. 55; Exhibit 3 (G) (2).**

26. At the time, Suplee was known to share and expose people who he thought were doing racist things and when he released things, it went "everywhere." **Exhibit 1, p. 71.**

27. Members of the public began sending e-mails to the School District that contained the Plaintiff's comment and requested that an investigation take place or that the Plaintiff be fired. AC, ¶ 88.

28. Later that same day, Friday, June 5, 2020, the School District placed the Plaintiff on paid administrative leave so that she could be investigated for "allegations of inappropriate and racially insensitive posts made by [her] on social media." AC, ¶¶ 89-91.

29. On Monday, June 8, 2020, the Plaintiff met with Tom Coogan, the Human Resources Director of the Fall River Public Schools, Maria Pontes, then Principal of the Kuss Middle School (now superintendent), and Rebecca Cusick, the president of the Plaintiff's union (FREA). AC, ¶ 92; **Exhibit 5 – Arbitration testimony of Rebecca Cusick, p. 192.**

30. At the meeting, the Plaintiff submitted a written statement that read, in part, "My unedited words that were completely out of context have portrayed me in a negative way. I deeply apologize for this. I have placed the [school] district in a negative light because of this and I am heartfully sorry to all my colleagues, my students, may administrators that have been forced to questions my integrity." AC, ¶¶ 93-94; **Exhibit 3 (B) (2).**

31. The Plaintiff admitted to making the comment but said that her post was taken out of context. AC, ¶¶ 94-97; **Exhibit 1, p. 65.**

32. The Plaintiff also apologized that the School District had to "deal with the fallout" caused by her Facebook statement. AC, ¶ 98.

33. Due to this public fallout, the School District issued a statement to the media. AC, ¶¶ 107-108; **Exhibit 11, pp. 520-521**.

34. The Media Release did not identify the Plaintiff by name. AC, ¶ 107.

35. The Media Release reads: "It was brought to our attention on Friday afternoon, June 5, 2020, that a teacher from the Matthew J. Kuss Middle School was alleged to have made some disgusting, racist, and bigoted comments on the social media platform, Facebook. AC, ¶ 107; **Exhibit 11, pp. 520-521**.

36. The Media Release informed the public that the School District had begun an investigation and placed the employee on paid administrative leave. AC, ¶ 107; **Exhibit 11, pp. 520-521.**

37. The Media Release informed the public that because the situation was "an ongoing active investigation to determine fact, we cannot comment any further on the specifics of the case." AC, ¶ 107; **Exhibit 11, pp. 520-521.**

38. The Media Release continued: "However, we can tell you that we are outraged by what we read from the Facebook screenshots, and we can confirm with conviction that the Fall River Public Schools do not tolerate any form of racist, bigoted, and/or hateful speech from any member of our professional community." AC, ¶ 107; **Exhibit 11, pp. 520-521**.

39. At the time of the Media Release, there were protests and riots and social unrest in Fall River and across the nation. **Exhibit 11, pp. 520-521**.

40. On Wednesday, June 10, 2020, Superintendent Matthew Malone issued a Notice of Intent to Dismiss Letter. AC, ¶ 113; **Exhibit 3 (A-J).**

41. The grounds for dismissal were the Plaintiff's making and posting racist and bigoted statements on the social media platform, Facebook. AC, ¶ 113; **Exhibit 3 (A-J).**

42.     The Superintendent found that the Plaintiff admitted that her comments and postings damaged the reputation of the Fall River School District. AC, ¶ 113; **Exhibit 3 (A-J).**

43.     Superintendent Malone found that on June 5, 2020, the Plaintiff posed on Facebook the following:

> **"There is one supreme race and gender and that is the white man-I also can't help but notice that race and gender were the ones leading most of the riots! Lastly if you look at the stats more black men have died from other black men than white men-so there lies two problems! But there are far more in equalities that will never change!" (Exhibit "C") (bold in original). Exhibit 3, p. 1.**

44.     Superintendent Malone found that the second and third sentences back up and support the initial racist declaration. **Exhibit 11, p. 502.**

45.     Superintendent Malone testified that the Plaintiff's statement was made in a very heightened state of our nation's history due to the pandemic and the social justice issues that were happening across the county, that the Plaintiff's statement was noticed by masses of people, both inside and outside of the school system, including parents, and that he received numerous calls e-mails. **Exhibit 11, pp. 503-504**.

46.     The notice also provided materials supporting the decision to terminate the Plaintiff's employment. AC, ¶ 113; **Exhibit 3 (A-J).**

47.     The notice of intent to dismiss letter provided that the Plaintiff would have an opportunity to present additional information in her defense; otherwise, the termination would become final on June 24, 2020. AC, ¶¶ 113, 116.

48.     On June 27, 2020, a meeting took place at the Superintendent's office. The Plaintiff was present and represented by both an attorney and union representative; also in attendance were Coogan, Pontes, and Malone. AC, ¶¶ 117-118.

49.  On July 1, 2020, the School District terminated the Plaintiff's employment for "conduct unbecoming" effective July 10, 2020. AC, ¶ 122; **Exhibit 11, pp. 528-529.**

50.  In the video posted by the Plaintiff, the commentator stated that the Black community really should be focusing on black men killing other black men and not on police brutality. AC, ¶¶ 127-128.

51.  Superintendent Malone found that to be a racist comment that is making excuses for structural racism inherent in our society. AC, ¶¶ 127-128.

52.  The Plaintiff's union voted not to fund her appeal to arbitration. AC, ¶ 123.

53.  The Plaintiff's local union representation shared with the School District that many of the union membership were deeply offended by the Plaintiff's remarks, and that the situation was not representative of their profession or the body of teachers who service the students at the Fall River Public Schools. **Exhibit 13 – Fall River's Answers to Interrogatories, Answer No. 12.**

54.  On September 17, 2021, the arbitrator found that the Plaintiff's conduct did not rise to the level of "conduct unbecoming" within the meaning of the statute and ordered her to be reinstated to her position with backpay and seniority credit. AC, ¶¶ 136-137.

55.  When the Plaintiff returned to work about one year later, she had an issue with a parent saying that she was racist and unfit to teach and some students made comments. **Exhibit 1, pp. 121-122.**

56.  In June of 2020, the Plaintiff was an avid Facebook user and was fully aware that comments can be cut and pasted and widely shared and comments "stay[] out there" on the platform. **Exhibit 1, pp. 52-53.**

57.     The Plaintiff admits that it is fair to say that someone reading her "one supreme race" statement may consider her a racist. **Exhibit 1, pp. 87, 89.**

58.     Three of the Plaintiff's co-workers and colleagues – Michael Thornton, Keith Michon, and Matthew Silva – were disturbed by the Plaintiff's comments and notified the school administration. **Exhibit 1, p. 84.**

59.     The Plaintiff says that she was terminated because Superintendent Malone wanted the public situation of her Facebook comments to go away. **Exhibit 1, p. 103.**

60.     The Plaintiff testified that the statement "there is one supreme race and gender, and that is the white man," is a conservative statement and during a period of time was considered true, going back to slavery. **Exhibit 1, pp. 103-104.**

61.     The Plaintiff doesn't know if her post caused disruption in the school district. **Exhibit 1, p. 104.**

62.     The Plaintiff's "one supreme race" comment was in response to and located under her Facebook friend Amy Frances's comment, "And again, words are my work, so "race" is another misnomer. Many evolutionary biologists and cultural anthropologists would argue that there is only one race, the human race. The earliest Homo sapiens appeared roughly 1.5 million years ago and "they" had dark skin." **Exhibit 1, pp. 109-110; Exhibit 3 (A) (3).**

63.     The Plaintiff testified that the whole reason she was fired was because the school district felt that she would be a concern due to her Facebook comments. **Exhibit 1, p. 121.**

64.     The Plaintiff testified at arbitration that she understood that as a teacher representing the district, her actions and comments affect not only her reputation but the reputation of the Fall River School Department. **Exhibit 1, p. 144.**

65. The Plaintiff agrees that a school cannot have a teacher who is a racist or bigot on staff at any time. **Exhibit 1, pp. 144-145.**

66. The Plaintiff agrees that it is very important for a school system and city to demonstrate that race and bigotry have no safe haven and must be rooted out wherever it appears. **Exhibit 1, pp. 144-145.**

67. The Plaintiff acknowledges that "due to the clear language of her [Facebook] comment, that parents, colleagues, students, and the public at large have a right to believe she is a racist candidly admitting: People would have good reason to question I was a racist." **Exhibit 1, p. 145.**

68. The Plaintiff admits that her conduct has substantially damaged her ability to perform the essential duties of a teacher. **Exhibit 1, pp. 145-146.**

69. The Plaintiff has stated that it was fair to expect that after reading or knowing of her racist comments, many students, especially students of color, would not trust that she would be fair and would be reluctant to share their concerns with her. **Exhibit 1, pp. 145-146.**

70. Rebecca Cusick was the president of the Plaintiff's teacher's union (FREA - Fall River Educators Association). **Exhibit 5, pp. 187-189.**

71. According to President Cusick, the Plaintiff's "one supreme race" statement brought negativity to the School Department. **Exhibit 5, p. 200.**

72. The Plaintiff's statement was "widespread" on social media, according to union president Cusick. **Exhibit 5, pp. 193, 196.**

73. Union President Cusick sent an email to all FREA membership reporting that the Plaintiff's "one supreme race" Facebook comment had caused a serious situation, with

news outlets carrying the story and sharing via social media. She reported that the administration and the School Committee have received numerous angry emails and calls demanding they take actions. President Cusick sent the email to calm the waters given the social media frenzy and to help union members understand that commenting and sharing and engaging in this social media activity was detrimental to everybody including the School Department. **Exhibit 5, p. 205; Exhibit 14 – Cusick's email to union membership, as forwarded by Superintendent Pontes, dated June 8, 2020.**

74. The Plaintiff's "one supreme race" comment took on a life of its own, with the news media and particularly Facebook. **Exhibit 5, p. 205.**

75. The school administration and School Committee received numerous angry e-mails and calls demanding they take action. **Exhibit 5, p. 205.**

76. Union President Cusick witnessed the negative comments about the Plaintiff, the school, and the profession. **Exhibit 5, p. 206.**

77. Michael Thornton was a special education teacher and colleague of the Plaintiff at Kuss Middle School. **Exhibit 6 – Arbitration testimony of Michael Thornton, pp. 371-373.**

78. Mr. Thornton knew the Plaintiff from passing by her in the hall, saying hi to each other, and being friends on Facebook. **Exhibit 6, pp. 373-374.**

79. In June of 2020, when Mr. Thornton saw the Plaintiff's "one supreme race" comment, he was "shocked," "disgusted," and thought it was "certainly white supremacist." **Exhibit 6, pp. 375, 379**.

80. Mr. Thornton did not report the comment to the School District because it had already come out on social media. **Exhibit 6, p. 376.**

81.   Mr. Thornton had previously observed that the Plaintiff had posted on Facebook that she was going to a "ghetto concert" when the concert featured black performers. **Exhibit 6, p. 386.**

82.   Keith Michon, Jr. worked with the Plaintiff as a teacher at the Kuss Middle School. **Exhibit 7 – Arbitration testimony of Keith Michon, Jr., pp. 427-429.**

83.   Mr. Michon characterized the Plaintiff's "one supreme race" comment as a racist statement. **Exhibit 7, pp. 432.**

84.   Parents were commenting and calling for the Plaintiff's termination. **Exhibit 7, p. 434.**

85.   The Plaintiff's racist statement was published widely and parents were upset. **Exhibit 7, p. 436.**

86.   This was a very serious situation. **Exhibit 7, p. 437.**

87.   Matthew Silva was the student support coordinator at Kuss Middle School in June of 2020. **Exhibit 8 – Arbitration testimony of Matthew Silva, pp. 337-338.**

88.   A school staff member forwarded the screenshot of the "one supreme race" comment because they wanted the administration to be aware. **Exhibit 8, p. 338.**

89.   Mr. Silva and other staff members felt the Plaintiff's comment was racist and sexist. **Exhibit 8, p. 340.**

90.   Mr. Silva forwarded the Plaintiff's comment to Maria Pontes, the principal of Kuss Middle School. **Exhibit 8, p. 343.**

91.   Mr. Silva spoke with approximately 15-20 staff, former employees, and Fall River employees who reached out about the Plaintiff's comment. **Exhibit 8, pp. 343-344.**

92.   Mr. Silva testified that people were very upset about the impact this would have on students and families. **Exhibit 8, p. 344.**

93. According to Mr. Silva, the Plaintiff's comment violated the safety and equity that Kuss staff tried to promote, and staff were worried of the impact this could have on the community and all the stakeholders, family members, students, and colleagues. **Exhibit 8, p. 346.**

94. According to Mr. Silva, the Plaintiff's comment caused unrest, but people stopped talking after the Plaintiff's termination. **Exhibit 8, p. 347.**

95. HR Director Coogan testified that the School District had to take action because the Plaintiff's comment drew commentary from both inside and outside the District and the District received complaints and emails from the community. **Exhibit 9, pp. 33-35.**

96. The District received 8-10 complaints during June 5-8 through a variety of sources – e-mails, software for registering complaints, forwarded screen shotes, calls, etc. **Exhibit 9, pp. 50-51, 60.**

97. The Plaintiff's comments created a "firestorm" as the remarks went viral and people were repeating things. **Exhibit 9, pp. 58-59.**

98. The comments became the focus of business that day. **Exhibit 9, p. 59.**

99. The situation was serious, widespread, viral, and was becoming a topic of news organizations. **Exhibit 9, pp. 59-60.**

100. NBC 10 in Providence (WJAR) became involved. **Exhibit 9, pp. 67-68.**

101. Kayla Medeiros, a former FRPS student, wrote to complain to the Kuss principal, Maria Pontes. **Exhibit 9, p. 71; Exhibit 11, pp. 508-509.**

102. Brianna Gill emailed, "Good morning, Principal Pontes. I was scrolling down Facebook where one of your Special Education inclusion teachers, Taryn Lopes Camara, posted an extremely inappropriate comment about the racial tensions going on. She is openly

saying white is the superior race, and male is the superior gender. This is not someone who should be working around children especially ones who need extra care. This woman has no respect for people of color. She barely has any human decency. I believe there needs to be an investigation of whether she is right for this position. These children should not be taught by someone with such a bias." **Exhibit 9, pp. 71-72; Exhibit 11, p. 509.**

103.   Alice Bloom wrote, "You have a white supremacist as a teacher. Please fire her. This is not okay." **Exhibit 9, p. 72; Exhibit 11, p. 509.**

104.   Angela Valles e-mailed the Superintendent, "Over the weekend I was informed about a teacher named Taryn Camara who works in the Fall River Schools Special Education Department. Racist comments were made by her on her personal Facebook Page claiming that white men are the superior race. I am personally affected by her posts in a multitude of ways. As a future educator myself, I would never allow somebody like that around students, especially vulnerable special needs students. Please address this publicly, as well as what the Fall River School Department will be doing in the future to ensure they do not employ any racist teachers. This is a detrimental matter." **Exhibit 9, pp. 73-74.**

105.   Lily MacDonald wrote, "I am writing to inform you of some behavior that has taken place online from one of your educators at Kuss Middle School. Special Education teacher Taryn Camara made a disgusting, racist, sexist, supremacist remark on Facebook. I will attach a screenshot of the comment below."

"Coming from a fellow educator, I think this is disgusting. Fall River public schools service a large, diverse population of students, and to have someone working with these students especially special needs student -- who makes their online views about white

supremacy known is not only irresponsible, but dangerous, aside from being a gross

misrepresentation of the Fall River Schools' mission statement."

"This comment has circulated widely on social media, and I assume it will continue to.

With everything going on in America right now, it is important schools play a role in

letting children know they are safe, protected, and cared about. But employing a teacher

who says these things does the opposite."

"I looked forward to hearing back from you in regard to this incident, and will be

disheartened if you make the choice to keep employing this individual. Again I have

attached the photo below. Thank you for your time." **Exhibit 9, pp. 74-75; Exhibit 11, p.**

**511.**

106.    After Superintendent Malone responded, Ms. MacDonald replied, "I am hoping this

situation will be taken care of. You may want to address the issue publicly as it has

spread all over social media and has caused outrage in the community." **Exhibit 9, pp.**

**75-76.**

107.    Dorian Frenette contacted the school via the School's software program called K12 Let's

Talk. Frenette attached a screenshot and wrote, "This was posted on social media by a

special ed. teacher in the Fall River public school system. I am disgusted that someone

with such intense racist views is teaching our next generation. I hope this will be dealt

with swiftly. Thank you." This was received on June 5th at 1:41 p.m., in the middle of the

school day. **Exhibit 9, pp. 80-81; Exhibit 11, p. 512; Exhibit 3 (D).**

108.    On Friday, June 5 at 4:27 p.m., an unknown person contacted the School District about

the Plaintiff's Facebook comment. **Exhibit 3 (E).** Among other things, the person wrote,

"it is absolutely unacceptance" to have the Plaintiff as a teacher, "[the Plaintiff's]

behavior needs to be immediately taken care of," [the Plaintiff's comment] reflects extremely poorly on this school system," "we cannot continue this kind of racism," and "Please fire this employee immediately." **Exhibit 3 (E).**

109. Michael Middleton e-mailed, "Hello. I'm writing because it caught my attention that you have a teacher saying racist things on Facebook, Taryn Camara. Seeing how she is in charge of our youth and future students, I hope you won't sit around and let this disgusting bigotry linger in your school system. I've attached the posts she has made." **Exhibit 11, p. 506; Exhibit 3 (F).**

110. The President of the Special Education Parents Advisory Committee (SEPAC), Tiffany Pineault, reported the post to the assistant superintendent for special education. **Exhibit 9, pp. 82-83; Exhibit 11, pp. 513-514.**

111. A student, Hallie Torres, class of 2025, wrote by e-mail to the school administration team, "Listen I know you guys probably aren't going to take this seriously but we thought it might be a good thing to bring it to your attention." **Exhibit 9, pp. 83-84.**

112. The student continued, "It's whatever if she has her opinions or whatever, but then she is posting it online and your STUDENTS can see it and share to other students, I don't know about you, but I see a problem. Kids' feelings can get hurt by stuff like this." **Exhibit 9, pp. 84-85.**

113. The School District estimated that it also received between 7-10 calls to the central office. **Exhibit 13, Answer No. 8.**

114. The Plaintiff posted a photo on Facebook where she is giving a Nazi salute and simulating a Hitler moustache (by placing two fingers over her lip). **Exhibit 3 (A)(9); Exhibit 12, pp. 673, 675.**

115.    The Plaintiff captioned the photo, "Welcome to Germany." **Exhibit 3 (A)(9).**

116.    Someone sent this photo to the School District, and it is included with her Notice of

Termination Letter. **Exhibit 3 (A)(9); Exhibit 9, p. 92.**

117.    The Plaintiff has explained that it was a parody and she was joking about a movie.

**Exhibit 12, pp. 673, 675.**

118.    Principal Maria Pontes found the Plaintiff's "one superior race" comments to be racially

charged and inappropriate, and "a racist statement." **Exhibit 10 – Arbitration testimony**

**of Maria Pontes, pp. 99-100.**

119.    Jesse Cohen, Michael Thornton, and Keith Michon were teachers at Kuss who

participated in the Facebook thread and objected to the Plaintiff's statements. **Exhibit 10,**

**pp. 100-101.**

120.    Principal Pontes testified that she would not have hired the Plaintiff because her

"comments are in direct conflict of what we stand for. We're a school system. We're

about providing access to all kids and having diverse staff and students, and that goes

against what we stand for." **Exhibit 10, pp. 101-102.**

121.    Pontes testified that the Plaintiff's comments placed a negative light on Kuss. It was in

the media and the District received e-mails. **Exhibit 10, pp. 105-106.**

122.    Matthew Malone served as the Superintendent of the Fall River Public Schools and had

previously served as the Commonwealth's Secretary of Education for Governor Deval

Patrick, among many other leadership roles in public education. **Exhibit 11, pp. 496-498.**

123.    Superintendent Malone testified that he terminated the Plaintiff's employment as a

teacher "for conduct unbecoming for promulgating racist commentary that was disruptive

to the good order and core beliefs of the school system." **Exhibit 11, p. 726; Exhibit 13, Answer No. 12.**

124. Superintendent Malone testified that the Plaintiff's viral "one supreme race" comment resulted in a significant disruption for the Fall River school system and at the time, the School District was dealing with providing education during the pandemic and "engaged in looking at active antiracism and how we have to respond to systemic inequities, systemic barriers to progress." **Exhibit 11, pp. 500, 521-523.**

125. Superintendent Malone testified, "the disruption involved a huge outcry around allegations of racism and beliefs of employees who were supposed to be working to support students and families in our school system, in a school system that is a majority minority school system. The commentary on Facebook was racist in nature, was outside the norms and beliefs of the school system, and therefore, there was a huge outcry of how can we tolerate such behavior from employees who were supposed to be entrusted to work with an support students and families in our school system." **Exhibit 11, p. 500.**

126. Superintendent Malone found that the Plaintiff did not accept responsibility for her comments and instead took the position that other people misinterpreted her comment so it was not her fault. **Exhibit 11, pp. 516-519; Exhibit 13, Answer No. 12.**

127. Superintendent Malone found that the Plaintiff did own that she put the School District in a negative light and she was sorry to her colleagues and students and administrators who had been forced to question her integrity. **Exhibit 11, pp. 516-517; Exhibit 13, Answer No. 12.**

128. It is extremely important that a student, parent and faulty have trust in a teacher. **Exhibit 11, pp. 525-527.**

129. Superintendent Malone testified that the Plaintiff's "one supreme race" comments should prohibit her from working in public education because of a loss of public trust based on her comments and her excuses. **Exhibit 11, p. 527.**

130. The Plaintiff was Facebook friends with as many as 20 co-workers. **Exhibit 12, pp. 594-595.**

131. The Plaintiff understands that she is responsible for what she puts on the internet and Facebook. **Exhibit 12, p. 729.**

132. The Plaintiff received and read the School District's social networking policy. **Exhibit 1, pp. 138-140; Exhibit 3 (H) and (I); Exhibit 9, p. 82.**

133. The Plaintiff is familiar with the School District's social media policy and during the annual teacher orientations, the principal of Kuss talks about being careful about what you put online and social media. **Exhibit 12, pp. 745-747, 749**.

134. The School District's policy is, in part, "[Employees] will be responsible should any information you intend to be private becomes public due to your own ignorance of the features of the social network you have decided to use or your failure to properly use such features." **Exhibit 3 (H) (p. 2) (1).**

135. "You must also know that any information you share privately with a recipient could be re-distributed but such recipient, without your knowledge or consent." **Exhibit 3 (H) (p. 2) (2).**

136. The policy specifically warns that "nothing you post online is ever truly 'private.'" **Exhibit 3 (H) (p. 2) (2).**

137. Restrictions are intended to maintain a teacher's status as an educator who should command and receive the respect of students, be able to maintain order and discipline in classrooms, and remain objective with respect to your students. **Exhibit 3 (H) (p. 3) (8).**

138. Any conduct, whether online or not, that reflects poorly upon the school district or consists of inappropriate behavior on the part of a staff member, may expose an employee to discipline up to and including discharge. **Exhibit 3 (H) (pp. 3-4) (9).**

139. The School District issues a social media policy to employees at the start of each year, which teachers are required to sign. The teacher's union also hosts social media trainings. **Exhibit 5, p. 203.**

140. The Plaintiff changed her Facebook name "after the firestorm of June 5th." There were "a lot of tumultuous comments, people reaching out to me, looking up my name**." Exhibit 12, p. 599.**

141. The Plaintiff agrees that the following is a racist statement: "There is one supreme race and gender and that is the white man." **Exhibit 12, p. 729.**

142. The Plaintiff agrees that her statement went viral and damaged her reputation. **Exhibit 12, p. 730.**

143. She admits that initially the racist statement had an effect on the Fall River School District. **Exhibit 12, p. 730.**

144. The Plaintiff understands that based on her statement, she would have to "build that trust for any student that I would have got in September of 2020, and I would have to rebuild that." **Exhibit 12, pp. 742-744.**

145. The Plaintiff admits that it's fair to expect that a parent who read her quote would be concerned about their child being in her classroom. **Exhibit 12, p. 744.**

146. The Plaintiff agrees that anyone who read her "one supreme race" statement would have a right to expect it was a racist comment made by somebody who had racist beliefs. "I believe they had the right to question me and to have doubt until they met me, yes, but then it's my job to explain otherwise…" **Exhibit 12, pp. 750, 762-764.**

147. The Plaintiff agrees that it is reasonable to believe that someone hearing her statement would believe that it's a racist statement and the person making the statement would be a racist. **Exhibit 12, pp. 750-752.**

148. The Plaintiff agrees that after her "one supreme race" comment, a child of color would have a right to question her fairness. **Exhibit 12, pp. 771-772.**

149. The Plaintiff agrees that it's critical for a School Department in the city to demonstrate that race and bigotry cannot exist in their community. **Exhibit 12, p. 773.**

150. The Plaintiff realizes that her choice of words in her "one supreme race" comment sounded like her opinion. **Exhibit 3 (A) (7).**

Respectfully submitted,
The Defendants,
City of Fall River, by and through its Treasurer, Ian P. Schachne, Fall River Public Schools, by and through its Superintendent, Maria Pontes, and Matthew Malone,
By their attorneys,

*/s/ Leonard H. Kesten*
Leonard H. Kesten, BBO# 542042
BRODY, HARDOON, PERKINS & KESTEN, LLP
265 Franklin Street, 12th Floor
Boston, MA 02110
(617) 880-7100
lkesten@bhpklaw.com

DATED: January 8, 2024

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

*/s/ Leonard H. Kesten*
Leonard H. Kesten

DATED: January 8, 2024