PAGES: 1 - 163
EXHIBITS:  1 - 6

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

TARYN CAMARA,
        Plaintiff,

   vs.

CITY OF FALL RIVER, FALL RIVER
PUBLIC SCHOOLS, By and Through Its
Superintendent, Maria Pontes,
MATTHEW MALONE; and
MICHAEL SUPLEE,
        Defendants.


### DEPOSITION OF TARYN CAMARA,

Plaintiff, taken pursuant to Rule 30 of the

Massachusetts Rules of Civil Procedure on

behalf of the Defendants, before Dawn M.

Baker, CSR, RPR, and Notary Public in and for

the Commonwealth of Massachusetts, at the

City of Fall River Law Department, One

Government Center, Fall River, Massachusetts,

on **Friday, July 28, 2023**, scheduled to

commence at 9:00 a.m., pursuant to Notice and

agreement of parties as to the date and time

of taking said deposition.

* * * * *

**GOUDREAU & GROSSI**
**COURT REPORTING SERVICE, INC.**

```
1    A.   Yes.
2    Q.   -- after Bishop Connolly and Our Lady of
3         Fatima, where else did you go to school?
4    A.   Fitchburg State College.
5    Q.   All right.  Four years?
6    A.   Yes.
7    Q.   And what degree did you have when you left
8         Fitchburg State?
9    A.   Dual certification.  Elementary one through
10        six and special needs moderate N through
11        nine.
12   Q.   And after Fitchburg, any other formal
13        education?
14   A.   No.
15   Q.   And going backwards -- well, strike that.
16             Currently, you work in the Fall River
17        school system, correct?
18   A.   Yes.
19   Q.   And you've been there for a number of years?
20   A.   Yes.
21   Q.   How many years, approximately?
22   A.   I'll be going into my 25th year this year.
23   Q.   All right.  Different schools?
24   A.   I was at Henry Lord when I first was hired.
```

| | |
|---|---|
| 1 | Then when I took my leave of absence, being |
| 2 | at home with the kids, I returned.  When I |
| 3 | returned in 2007, I started at Kuss Middle |
| 4 | School.  Matthew J. Kuss Middle School. |
| 5 | Q. When you went to Henry Lord in the beginning, |
| 6 | what were you teaching? |
| 7 | A. Special needs.  At that time, I was a teacher |
| 8 | in a resource room. |
| 9 | Q. Okay.  How many years were you at Henry Lord? |
| 10 | A. Eight. |
| 11 | Q. And then how many years did you take off |
| 12 | before returning to Kuss in 2007? |
| 13 | A. I want to say six.  Six years. |
| 14 | Q. When you went to Kuss in 2007, what were you |
| 15 | teaching? |
| 16 | A. Inclusion special needs. |
| 17 | Q. And did that job title change at all over the |
| 18 | years? |
| 19 | A. No. |
| 20 | Q. Is that your title today? |
| 21 | A. Yes. |
| 22 | Q. When did school get out this year? |
| 23 | A. June 15th -- June 16th. |
| 24 | Q. And since June 16, 2023, any involvement with |

```
 1   Q.   All right.  So if you recall watching three
 2        or four, and you also indicated that you
 3        don't know from watching the riot who's
 4        really leading the riot, how can you conclude
 5        that the white man was leading most of the
 6        riots?
 7   A.   Again, I think we're -- I mean, was I wrong
 8        in saying that white men are leading the
 9        riots?  Possibly.  My point is there was
10        nothing racist in me saying that statement, I
11        mean, initially.  And anyone who reads it
12        into the entirety can tell that I'm referring
13        to that race and gender by my initial
14        statement.
15   Q.   All right.
16   A.   Again, we can all have different
17        interpretations of it.
18   Q.   And you know on Facebook things are cut and
19        pasted all over the place, correct?
20   A.   Uh-huh.
21   Q.   Your post is a good example where somebody
22        took a cut and paste with no other context
23        behind it and posted it.  And you were an
24        avid Facebook -- I don't know -- preparer or
```

|  |  |  |
|---|---|---|
| 1 |  | writer or dictator back in June of 2020, |
| 2 |  | correct? |
| 3 | A. | Yes. |
| 4 | Q. | So you were fully aware of that happening as |
| 5 |  | a possibly at that point in time, right? |
| 6 |  | I mean, we always tell our kids be |
| 7 |  | careful what you put out there because once |
| 8 |  | you put it out there, it stays out there, |
| 9 |  | right? |
| 10 | A. | Absolutely. |
| 11 | Q. | And were you also, at one point in time, an |
| 12 |  | English teacher?  Why do I think that? |
| 13 | A. | Well, I'm an ELA special needs English |
| 14 |  | teacher, yes. |
| 15 | Q. | All right.  I guess the ELA thing threw me |
| 16 |  | off. |
| 17 | A. | Yes. |
| 18 | Q. | So you know words, especially when they're in |
| 19 |  | print, can have multiple meanings, right? |
| 20 | A. | Yes. |
| 21 | Q. | And in this case, somebody by the name of |
| 22 |  | Michael Suplee, S-U-P-L-E-E, took your |
| 23 |  | post -- |
| 24 |  | MR. HOWAYECK:  Can you make that |

| | |
|---|---|
| 1 | Exhibit 2? |
| 2 | (Exhibit No. 2, Copy of Facebook |
| 3 | Page, so marked.) |
| 4 | Q. -- took your post and reposted it which |
| 5 | appears to be on his Facebook page.  Is that |
| 6 | correct? |
| 7 | A. Yes. |
| 8 | Q. And he has your post side by side with who |
| 9 | you are or at least a screenshot, I guess, of |
| 10 | your Facebook page.  Is that what that's |
| 11 | supposed to represent? |
| 12 | A. Yes. |
| 13 | Q. All right.  And he then writes "disgusting |
| 14 | and apparently a special ed teacher in Fall |
| 15 | River." |
| 16 | You saw that, obviously? |
| 17 | A. Yes. |
| 18 | Q. All right.  And that -- when you saw that, |
| 19 | how did you feel? |
| 20 | A. Well, I had a colleague call me to tell me |
| 21 | that this was out there.  So when I saw it, |
| 22 | it was just like I need to talk to this guy. |
| 23 | What is he doing?  Why is he sharing such a |
| 24 | thing?  How did he get it?  You know, there |

```
1          was a lot of that.
2     Q.   Right.  And he quoted the entire quote that
3          we already said out loud starting with "There
4          is one supreme race" all the way down to
5          "inequalities that will never change."
6          Right?
7     A.   Uh-huh.
8     Q.   And after he read it, it appears that he did
9          not look upon that as favorably or as not
10         anything other than a racist comment.  Is
11         that fair to say?
12    A.   Yes.
13    Q.   And other people, when they read it, believed
14         that it was a racist comment, correct?
15    A.   Well, I think once you have a tag line of
16         "disgusting and apparently a special ed
17         teacher in Fall River," whether they read it,
18         whether they try to understand it, whether
19         they ask the question what other things could
20         she mean, you know, his following was, you
21         know, spread this word.
22              I think, you know, we can sit and say
23         anyone can interpret anything the way they
24         want to interpret it, and at the end of the
```

```
 1   A.   I'm referring to Exhibit 2.  Absolutely.
 2             And there begins many other
 3        interpretations of what they missed, what
 4        else is out there, and that is where Malone
 5        went wrong.  I think if he had been counseled
 6        before he released this, he would have been
 7        told that, and that's where he went wrong,
 8        and that's really where he violated the law.
 9        He already claimed I was that.
10   Q.   Well, again, you're not identified
11        specifically there, correct?
12   A.   I'm a Matthew J. Kuss Middle School teacher.
13   Q.   Okay.  How many teachers are at the Matthew
14        J. Kuss Middle School?
15   A.   I don't know.  Maybe 80.
16   Q.   Okay.  And do you know what the race makeup
17        of Matthew J. Kuss middle school is?
18        Students.
19   A.   Students?  I mean, then?  Maybe -- honestly,
20        no, I don't know.
21   Q.   All right.  I read in the transcript somebody
22        said about 50/50, 50 white, 50 other races.
23        Is that about what you might --
24   A.   Yes.
```

```
 1    Q.    -- perceive?
 2                Okay.  And are you able to tell me if
 3          Exhibit 2 was published on Facebook before
 4          Exhibit 1 was created?
 5    A.    If -- ask that question again.
 6    Q.    I guess I'm trying to figure out what came
 7          out first, Exhibit 1 or Exhibit 2,
 8          chronology-wise.  We know Exhibit 1 is dated
 9          June 8th.
10    A.    Exhibit 2 came before Exhibit 1.
11    Q.    All right.  And do you know if Exhibit 2 came
12          out on the same day of your post, June 5th?
13    A.    It did not.
14    Q.    Do you know if it was the next day?
15    A.    This?
16    Q.    Yes.  Exhibit 2.
17    A.    Exhibit 2 probably came out June 5th, yes.
18    Q.    Okay.
19    A.    Because it was at 1:03.  Yes.  This was on
20          June 5th.
21    Q.    And you have a suspicion, at least, of how
22          Michael Suplee obtained that post?
23    A.    Absolutely.
24    Q.    And how do you believe he obtained that post?
```

```
 1         know, just -- I don't even honestly know if I
 2         needed to do that letter.  You know, it was
 3         just told to me by Rebecca to -- to write it.
 4    Q.   Did Leigh -- did you have counsel at this
 5         meeting?
 6    A.   I did not have counsel at that meeting.
 7    Q.   Okay.  Did Tom Coogan -- what was Tom
 8         Coogan's role, or what did he say at that
 9         meeting?
10    A.   He just said that he was going to take that
11         information and give it back to the
12         superintendent.
13    Q.   Okay.  Did he offer -- did he ask you any
14         questions?
15    A.   He just asked me mainly did you write this.
16         You know, did -- is this you or -- that
17         was --
18    Q.   And how did you respond?
19    A.   I said this is my post.  No one else --
20    Q.   Okay.
21    A.   -- posted it.
22    Q.   And did you --
23    A.   No one hacked my page.
24    Q.   Did he ask you any other questions?
```

```
 1   A.   I mean, he was -- Mike Suplee, again, no one
 2        that I knew, but he was known to -- at that
 3        time, to really share and expose people who
 4        were doing, in his opinion, racist things.
 5   Q.   Okay.  So --
 6   A.   So whoever gave that --
 7   Q.   -- that was his job?
 8   A.   -- to him -- it wasn't his job, but that was
 9        what he was known to be doing at that time.
10        If you had pulled any of his -- I mean,
11        his -- his page was not private, so he had --
12        when he released things, it went everywhere.
13   Q.   Okay.  So he was -- well, strike that.
14              So there were at least four people
15        that were concerned of the post that informed
16        the administration.  Actually, Michael Suplee
17        probably never informed the administration.
18        But by that point in time, were you made
19        aware that people called up and emailed the
20        administration?
21   A.   At what point in time?
22   Q.   The time of your meeting on June 8th.
23   A.   No.  I was not aware of phone calls or emails
24        or how -- no.
```

```
 1          weren't terminated at that point in time --

 2          what other investigation were you expecting

 3          of him or of the school district if he

 4          already had your entire thread that preceded

 5          your post?

 6                     What other expectation did you have

 7          as far as investigation?

 8    A.    Interview my colleagues, seeing how they

 9          felt.

10    Q.    Well, wasn't it clear already at that point

11          in time that your colleagues, Keith Michon

12          and Michael Thorton and Matt Silva, were

13          already disturbed by your post, and they're

14          the ones that approached the administration?

15    A.    I don't think those three colleagues were the

16          best and only people to refer to.

17    Q.    Who else did you want the superintendent to

18          refer to?

19    A.    Well, seeing that we're doing an

20          investigation and we're trying to claim that

21          someone is disgusting, racist, and bigoted, I

22          believe you have to have more than just the

23          three men who have conservative views and

24          were quick to jump on this.
```

1    be a racist?"  And your answer was "that

2    didn't know me" referring to the person if

3    they believed that, they don't know me.  He

4    says "correct?"  And you say "yes."

5          Thereafter, you indicated, "I said

6    that if they didn't know me, it is fair to

7    say they would question whether or not I was

8    a racist."

9          So is it fair to say that someone

10   reading the statement, that you have in front

11   of you in Exhibit 2, doesn't know you, that

12   it's fair to say that they may consider you a

13   racist?

14  A.   Yes.

15  Q.   Okay.  And when the superintendent of

16       schools, Matthew Malone, ultimately sent you

17       a letter of termination, is it fair to say

18       that part of his motivation was the concern

19       of the general public of the perception they

20       have of a teacher who would have written that

21       post?

22  A.   No.

23  Q.   That's not fair to say?

24  A.   No.

1        with --

2    A.  Well, when I say the entirety, I do mean this

3        whole thing.  Like I'm not saying the thread.

4        When I say the entirety --

5    Q.  Okay.

6    A.  -- I really believe that when you read this

7        whole thing, it's -- you know, I mean,

8        it's...

9    Q.  Do you think it's clear?

10   A.  I don't think it's clear.  I think,

11       obviously, it's very jumbled, and it

12       certainly could be misconstrued in many

13       different ways but...

14   Q.  If I was to read -- if I was a literalist and

15       I'm reading the plain meaning of the words

16       you wrote, is it fair to say that one would

17       definitely then believe that the person

18       writing this is racist?

19   A.  Possibly.

20   Q.  Okay.  Well, one of your comments, I

21       believe -- and maybe it was the answers to

22       interrogatories or somewhere else -- you

23       justified the writing as sarcasm and a

24       paradoxal way of writing.

```
 1   A.    I don't know.
 2   Q.    -- quelling the public concern?
 3               At that point in time, this is out in
 4         the public, and they're receiving emails and
 5         calls, correct?
 6               MR. GAGLIARDI:  I'll just object.
 7         She can't testify as to what their
 8         motivations were and what they were thinking.
 9   A.    I mean, I can assume it.  I can say yes, but,
10         I mean, I don't know.  Because I don't think
11         anyone had any say other than the
12         superintendent.  He had full say.
13   Q.    So you believe that you were terminated by
14         Malone solely because he doesn't believe in
15         your conservative thought?
16   A.    Yeah.  And I think he just wanted it to go
17         away, and he figured by me going away, it
18         would go away.  Instead of, you know, making
19         a stand that he interviewed and -- I just
20         don't...
21   Q.    Let me ask you this:  Looking at the first
22         part of your post, "there is one supreme race
23         and gender, and that is the white man," is
24         that a conservative statement?
```

1   A.   I think that is --

2   Q.   I suppose an extreme conservative statement?

3   A.   Yeah.  It's also, unfortunately --

4   Q.   The truth?

5   A.   -- a period of time it was.  A period of time

6        that seemed like how everyone felt.  I mean,

7        if you go back to slavery, it was the white

8        man that was dictating, so, you know...

9   Q.   So is there -- I mean, doesn't Candace Owen

10       even believe that Hitler had the right

11       philosophy within Germany, and she only

12       believes that when he went outside Germany,

13       that he went wrong?

14            MR. GAGLIARDI:   Objection.

15  A.   I don't know that.

16  Q.   You don't know that?

17  A.   I don't know that.

18  Q.   Okay.

19  A.   So no.

20  Q.   Is it fair to say that your post caused

21       disruption in the school district?

22            MR. GAGLIARDI:   Objection.  It's a

23       comment.

24  A.   Honestly, I don't know.

```
1            THE WITNESS:  She needs to do that?
2            MR. HOWAYECK:  -- iswhat Mark
3    suggested.  We'll call it 81-1, 81-2, 81-3.
4            MR. GAGLIARDI:  88.
5            MR. HOWAYECK:  88.
6            MR. GAGLIARDI:  Yeah.
7            MR. HOWAYECK:  We'll restaple it, and
8    mark that as Exhibit 3B.
9            If you want to staple that.
10           THE WITNESS:  But there's no numbers
11   on these.
12           MR. GAGLIARDI:  They're going to
13   handwrite them.
14           MR. HOWAYECK:  88-3.
15           THE WITNESS:  So then she needs to
16   put a tag on this?
17           MR. HOWAYECK:  Yes.  Madam
18   Stenographer, can you please mark that as
19   Exhibit 3B?
20           And if you're so inclined, starting
21   with page 1, write 88-1, 88-2, 88-3 on the
22   bottom of each page.
23           (Exhibit No. 4, Copies of Facebook
24   Pages, so marked.)
```

1        MR. HOWAYECK:  For the record, we

2     struck that 3B would an exhibit.  We're

3     calling it Exhibit 4.

4  Q.  And, Taryn, can you just describe briefly

5     what Exhibit 4 is?  If you could identify

6     what those threads are indicating.

7  A.  This is where the thread began -- 88-1 begins

8     the thread because Amy Frances begins a

9     thread with her words --

10 Q.  So is that --

11 A.  -- at the top of that.

12 Q.  Yeah.  So is that the name that you can't

13    read?

14 A.  Yes.  That's Amy Frances.

15 Q.  All right.  And her post begins "and again,

16    comma"?

17 A.  Yes.

18 Q.  All right.  So is Amy Frances' comment and/or

19    thread in relationship at all with Exhibit 3?

20 A.  Yes.

21 Q.  It is?

22 A.  Part of this, yes.

23 Q.  So Amy Frances commented on the thread that

24    started with Candace Owen?

1   Q.   Who's "they"?

2   A.   The whole reason why I was fired was because

3        they felt that, you know, I would be a

4        concern.

5   Q.   No, no, no.  Maybe you misunderstood my

6        question.

7             Any backlash to you?  Do you go in

8        and do people, you know, call you names?  Do

9        they treat you differently?

10  A.   No.  But I did have one parent my first year.

11       From October to March, there was small, you

12       know, little comments, you know, from

13       students.  Never that they really went

14       anywhere, but I did have a parent that came

15       in, referred to --

16  Q.   What parent was that?

17  A.   A parent of a student that I had.

18  Q.   Do you know the name of the parent?

19  A.   I don't.

20  Q.   Do you know the race of the parent?

21  A.   She was white.

22  Q.   Okay.  And what was her concern or voice?

23  A.   She basically had a parent/teacher

24       conference.  At that time my co-teacher had

1    left.  She was out on leave, and I was the

2    acting teacher.  So the first time for

3    parent/teacher conference.  She was concerned

4    that the teacher wasn't following her

5    daughter's IEP, so, you know, I basically

6    spoke to the parent to let her know that, you

7    know, I was aware of her IEP and reassured

8    her.

9         So when she came in in March, I

10   really wasn't expecting there to be any issue

11   because I had already met her, and she waited

12   until the very end of parent/teacher, and she

13   basically began to say that I was unfit.  I

14   shouldn't teach.  That I was racist.  She was

15   upset.

16        At that time, another teacher

17   notified the principal, and because it was

18   the end of the night, I sat in the office

19   with that parent, her son, not the -- not the

20   child I taught.  I taught her daughter.  She

21   came in after.  So it was the three of them,

22   my vice principal, and my principal.

23   Q.  Did she indicate to you at all why she had

24       that opinion?

1      answer.

2  Q.  I'm still waiting for an answer.

3          MR. GAGLIARDI:  I also believe this

4      has been asked and answered several times.

5  A.  I think it's a vague question.  I mean, I

6      can't -- I know people that read it that

7      didn't, and I know people that read it that

8      did, so, I mean, is it fair to say they

9      could?  Anyone can interpret anything they

10     need to.

11  Q.  Do you know how many times that statement --

12     and I'm referring to kind of like the

13     ultimate statement that and here are the

14     white supremacists -- was reposted on

15     Facebook?

16  A.  No.

17  Q.  Would you agree, though, it went viral?

18  A.  Yes.

19  Q.  All right.  And would you agree that that

20     statement ultimately did have an affect on

21     the Fall River School district?

22          MR. GAGLIARDI:  Objection.  Just to

23     the term affect.

24  Q.  Well, you've answered yes before.  Do you

```
 1         want me to read the transcript?
 2  A.    Anything is going to have an effect.
 3         Anything negative said about anyone is going
 4         to have effect, so, yes, it would have an
 5         effect.
 6  Q.    Okay.  You're aware of the school social
 7         networking policy, right?
 8  A.    Yes.
 9  Q.    All right.
10               MR. HOWAYECK:  We might as well mark
11         this as an exhibit.  6, is it?
12               (Exhibit No. 6, Social Networking
13         Websites, Fall River Public Schools, so
14         marked.)
15  Q.    You've read this policy?
16  A.    Uh-huh.  Yes.
17  Q.    You're aware of the policy?
18  A.    Yes.
19  Q.    This says adopted March 12th of 2012.  Do you
20         know if that was the policy in effect at the
21         time that you were posting on Facebook in
22         June of 2020?
23  A.    I don't know.  I'll assume yes.  I don't
24         think -- it's never changed.
```

1   Q.   If you don't know, you don't know.   That's

2        okay.

3             On page 2, under number 1, the last

4        sentence reads "You will be responsible

5        should any information you intend to be

6        private becomes public due to your own

7        ignorance of the features of the social

8        network you have decided to use or your

9        failure to properly use such features."

10            You're aware of that?

11  A.   Yes.

12  Q.   Okay.   So you were aware that nothing that

13       you post on Facebook is truly private,

14       correct?

15  A.   Yes.

16  Q.   At your hearing, the arbitration hearing,

17       Mr. Thorton testified that he was shocked and

18       disgusted when he saw the comment on

19       Facebook.   Do you recall that testimony?

20  A.   Yes.

21  Q.   And he is an individual who was a friend of

22       yours on Facebook, correct?

23  A.   Yes.

24  Q.   And he was a person who knew you?

```
 1   A.   Yes.
 2   Q.   And he's a person that you would have
 3        expected to get your sarcasm as you were
 4        putting it?
 5   A.   Yes.
 6   Q.   And how come he didn't get your sarcasm?
 7             MR. GAGLIARDI:   Objection.
 8   A.   He has different views than me.
 9   Q.   Okay.  And Michon testified that your
10        comments were unquestionably racist.  Do you
11        recall that testimony?
12   A.   I don't remember those exact words, no.
13   Q.   Do you recall receiving the transcript --
14        strike that -- the arbitrator's opinion and
15        award?
16   A.   Yes.
17   Q.   Did you end up reading it?
18   A.   Yes.
19   Q.   Do you remember Cusick who at the time was
20        the president of the union?  Rebecca Cusick?
21   A.   Yes.
22   Q.   Okay.  Do you recall her testifying at that
23        hearing that your comments were a racist
24        comment that damaged the reputation of the
```

```
 1        colleagues, students, and the people of Fall
 2        River?
 3   A.   I think the word damage is -- I couldn't
 4        really say today that I feel like it was a
 5        damage.
 6   Q.   Let me read the whole paragraph, and tell me
 7        if there's anything you disagree with what
 8        she wrote.  And she then puts in parentheses
 9        your testimony pages so you can look at that.
10             "Camara testified that she understood
11        that as a teacher representing the district,
12        her actions and comments affect not only her
13        reputation but the reputation of the Fall
14        River School Department."
15             You agree with that?
16   A.   Yes.
17   Q.   Okay.  "She agreed that a school cannot have
18        a teacher who is a racist or bigot on its
19        staff at any time, and that it is very
20        important for a school system and city to
21        demonstrate that race and bigotry have no
22        safe haven and must be rooted out wherever it
23        appears."
24             Correct?
```

```
 1   A.   Yes.
 2   Q.   "She, Camara, acknowledged that due to the
 3        clear language of her comment, that parents,
 4        colleagues, students, and the public at large
 5        have a right to believe she is a racist
 6        candidly admitting:  People would have good
 7        reason to question I was a racist."
 8                 That's what you stated?
 9   A.   Yes.
10   Q.   Okay.  "As such she stated that it was fair
11        to expect, that after reading or knowing of
12        her racist comments, that many students,
13        especially students of color, would not trust
14        that she would be fair and that they would be
15        reluctant to share their concerns with her."
16                 MR. GAGLIARDI:  I'm sorry.  Where are
17        you reading from?
18                 MR. HOWAYECK:  Page 10 of the
19        transcript of the arbitration decision.  I
20        didn't mark that as an exhibit.
21   Q.   Do you want to read it yourself?
22   A.   Yeah.
23   Q.   It's what I underlined right there.
24        Actually, just read it out loud so it's --
```

1    make sure we're reading the same thing.

2  A.   "When questioned as to her ability to return

3    to effectively teach school in Fall River,

4    Camara admitted that her ability to perform

5    the essential duties of a teacher have been

6    substantively damaged by her conduct.

7          As such, she stated that it was fair

8    to expect -- fair to expect, that after

9    reading or knowing of her racist comments,

10    that many students, especially students of

11    color, would not trust that she would be fair

12    and she would be reluctant to share their

13    concerns with her."

14  Q.   Okay.  The arbitrator is saying that's what

15    your testimony stated at the hearing.  Is

16    that accurate?

17  A.   Yes.

18  Q.   Okay.  When was the last day of the hearing?

19    Do you recall?

20  A.   No.

21          MR. HOWAYECK:  I'm almost done.

22          There's one thing I'm looking for.

23    Nothing too exiting.  Just...

24          Off the record for a second.

GOUDREAU & GROSSI COURT REPORTING SERVICE, INC.
(508) 823-4659

```
 1                    (Off the record.)
 2   Q.   All right.  Isn't it true that your comment
 3        was also posted, if you recall, on the Fall
 4        River Reporter?
 5   A.   Yes.
 6   Q.   All right.  And reposted by Erica Scott?
 7   A.   Yes.
 8   Q.   All right.  And you're not -- you choose not
 9        to sue them, correct, or the entity, Fall
10        River Reporter?
11   A.   No.
12   Q.   Is there a reason why you didn't sue them?
13        If you know.
14   A.   I don't know.
15              MR. HOWAYECK:  Let's just take a
16        two-minute break.
17              MR. GAGLIARDI:  Okay.
18                    (Off the record.)
19   Q.   All right.  What are you seeking as a result
20        of this lawsuit?
21              Other than monetary damages, I
22        suppose.  Is there anything else that you're
23        looking for?
24   A.   No.  I mean, I'm not --
```