# In The Matter Of:

*Arbitration*

*Camara and Fall River Public Schools - Day 3*

*June 9, 2021*



ALLIED COURT REPORTERS, INC.
— AND —
VIDEO CONFERENCE CENTERS

50 YEARS

1                   AMERICAN ARBITRATION ASSOCIATION

2


3        PROCEEDINGS IN RE VIA VIDEOCONFERENCE:

4        CASE NUMBER:  01-20-0014-5686

5        TARYN CAMARA

6        -and-

7        FALL RIVER PUBLIC SCHOOLS

8        GRIEVANCE:  MASSACHUSETTS GENERAL LAW CHAPTER 71
                     SECTION 42 -- DISMISSAL
9


10       DAY 3

11                               JUNE 9, 2021
                                 10:00 A.M.
12


13

14       BEFORE VIA VIDEOCONFERENCE:

         ARBITRATOR ELIZABETH NEUMEIER
15


16       APPEARANCES VIA VIDEOCONFERENCE:

17       FOR THE PETITIONER:
         LAW OFFICE OF MARK P. GAGLIARDI
18       BY:  MARK P. GAGLIARDI, ESQUIRE

19       FOR THE RESPONDENT:
         LAW OFFICE OF BRUCE A. ASSAD
20       BY:  BRUCE A. ASSAD, ESQUIRE

21

         ALSO PRESENT VIA VIDEOCONFERENCE:  TARYN CAMARA,
22       THOMAS COOGAN, SHERI DiPRETE

23

24

25

```
1                          I N D E X

2   WITNESS                                        PAGE

3   MICHAEL THORNTON
          DIRECT EXAMINATION BY MR. ASSAD          371
4         CROSS-EXAMINATION BY MR. GAGLIARDI       379
          REDIRECT EXAMINATION BY MR. ASSAD        417
5         RECROSS-EXAMINATION BY MR. GAGLIARDI     419
          FURTHER REDIRECT EXAMINATION BY MR. ASSAD 422
6   KEITH MICHON, JR.
          DIRECT EXAMINATION BY MR. ASSAD          427
7         CROSS-EXAMINATION BY MR. GAGLIARDI       439
          REDIRECT EXAMINATION BY MR. ASSAD        493
8   MATTHEW MALONE
          DIRECT EXAMINATION BY MR. ASSAD          496
9         CROSS-EXAMINATION BY MR. GAGLIARDI       532

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

            ALLIED COURT REPORTERS, INC. (401) 946-5500
```

1                    MATTHEW MALONE (SWORN)

2            DIRECT EXAMINATION BY MR. ASSAD

3    Q.   Superintendent Malone, would you give your full

4         name for the record, please.

5         A. Sure.  Matthew Hunter Malone.

6    Q.   And, Superintendent Malone, would you please

7         provide the arbitrator with your educational

8         background?

9         A. Sure.  Graduated from high school, 1988.  I

10        have a Bachelor's degree in history from Suffolk

11        University in 2003.  I have a Master's degree in

12        education from Boston College 20 -- I'm sorry,

13        1993 for my Bachelor's.  My Master's is 1995, and

14        then I have a Ph.D. from Boston College in school

15        leadership in 2000.  In addition to that, I have

16        several executive fellowships, one with the Broad

17        Foundation For Urban Superintendents, and another

18        with a joint venture between Harvard Business

19        School and the Harvard Ed. School called The

20        Public Education Leadership Program.

21   Q.   And, Superintendent Malone, would you please

22        relate to the arbitrator your professional

23        background?

24        A. Sure.

25   Q.   And the positions you've held, and their duties

1    and responsibilities.

2    A. Sure.  One of the things I pride myself in is

3    that I'm a superintendent that has held

4    essentially every position in the field.  I

5    started as a substitute teacher in Boston.  Then I

6    moved up to a paraprofessional and started at the

7    King Middle School in Dorchester.  I worked there

8    for two years while I was getting my Master's

9    degree, and I was hired to be a teacher at the

10   Jeremiah Burke High School in 1995, which was the

11   state's first turnaround school.  I worked at the

12   Burke for four years.  I was the history/social

13   studies coordinator for the building, and

14   classroom teacher.

15        From there I served as assistant principal

16   for one year in Duxbury, Massachusetts.  The

17   following year I returned to Boston to lead the

18   high school renewal initiative, and I was a high

19   school principal in Boston at South Boston High

20   School.  I stayed there for four years, at which

21   point I was recruited to be assistant

22   superintendent in San Diego.  So I moved to

23   California and served in the San Diego city

24   schools for 18 months, and came back to

25   Massachusetts to serve as superintendent in the

1  Swampscott public schools.  I was superintendent

2  there for four years, when I left to become the

3  superintendent in the Brockton public schools.  I

4  was superintendent in Brockton for four years,

5  when I left to serve as Secretary of Education for

6  Governor Patrick.  I served the Commonwealth of

7  Massachusetts in that capacity for two years.

8       Following that, I did a interim stint as

9  superintendent in Saugus, Mass., and then I became

10  the superintendent in Fall River in 2016.  I have

11  been the superintendent here for five years.

12  Q.  Could you just go over just briefly what your

13       duties and responsibilities were as Secretary of

14       Education?

15  A. Sure.  As Secretary of Education I was

16       responsible for all of the education policy, K-12,

17       early childhood, higher ed., and the UMass system.

18       So I served on all four Boards of Education as an

19       ex officio member, and I coordinated all of the

20       activities across the Commonwealth for the

21       Governor's office in relation to education, and

22       put together the $6 billion education section of

23       the state's $36 billion at the time, 2015 budget.

24       Our daily responsibilities included the

25       management of the executive office, all touch

1    resulted in the, probably the largest disruption

2    we've had to our school system in my five-year

3    tenure here as superintendent.

4    Q.   Could you describe what the disruption was?

5         A. So the disruption involved a huge outcry around

6    allegations of racism and beliefs of employees who

7    were supposed to be working to support students

8    and families in our school system, in a school

9    system that is a majority minority school system.

10   The commentary on Facebook was racist in nature,

11   was outside of the norms and beliefs of the school

12   system, and, therefore, there was a huge outcry of

13   how can we tolerate such behavior from employees

14   who were supposed to be entrusted to work with and

15   support students and families in our school

16   system.

17   Q.   So I'm going to ask that you look at Exhibit 1,

18   Pages 7 through 15.

19        A. Yes.

20   Q.   And ask if you have seen those posts before?

21        A. These posts were brought to my attention in the

22   first week of June of 2020, and we immediately

23   conducted an investigation to determine the

24   accuracy and relevancy of such.

25   Q.   I'm going to ask that you look at Page 9.

1      A. The comment states specifically, "There is one

2      supreme race and gender and that is the white man

3      -- I also can't help but notice that race and

4      gender were the ones leading most of the riots.

5      Lastly if you look at the stats more black men

6      have died from other black men than white man --

7      so there lies two problems!  But there are far

8      more inequalities that will never change!"

9   Q.  What concerned you about that statement?  What was

10      your opinion of it?

11      A. So my concern with this statement was that the

12      statement specifically calls out in very explicit

13      language that there is -- that the white man is

14      the ultimate race.  That's my interpretation of

15      it.

16  Q.  And is there anything else in that statement that

17      would contradict your opinion of what that

18      statement says, any of the other sentences?

19      A. No.  I think the other sentences back up and

20      support the initial declaration.

21  Q.  Now, how did this particular statement come to

22      your attention?  Do you recall who brought it to

23      your attention when you received it?

24      A. Well, in a very short period of time, in a very

25      heightened state of our nation's history, for two

1      reasons, one, the pandemic; and, two, the social

2      justice issues that were happening across the

3      country, this was immediately noticed by

4      multitudes, masses of people.

5           It was brought to my attention both

6      internally by other employees, and then externally

7      by parents, and then outside of parents also folks

8      that I don't know from across the country, who

9      were also, because of the way social media is,

10     were privy to the comments.

11  Q.  Approximately how many comments did you receive

12     from parents?

13     A. Twenty, at least.

14  Q.  Do you recall the names of the parents?

15     A. I do not recall them off the top of my head,

16     but I know there is evidentiary citation of such

17     in the packet here.

18  Q.  How about, you mention about complaints or issues

19     you had received from outside of the parents?

20     A. I received several e-mails, calls from folks

21     that aren't connected to the Fall River public

22     schools, outside of Massachusetts, saying we want

23     to bring this to your attention, do you know about

24     this?  And I had a response that I sent.  You have

25     a copy of it in the file, and that was the

1      response that I sent to every one of the e-mails

2      that I received.

3  Q.  We're going to get to that.  When you received

4      notification of this, and the calls started coming

5      in, what did you do?  Who did you talk to and what

6      did you do?

7      A. So I immediately spoke with my leadership team,

8      which included our HR director, Mr. Coogan, and

9      our assistant superintendent, and other members of

10     my team as to what do we do.  I also looped the

11     union in, to let them know that I would be taking

12     immediate action on one of their members.

13  Q.  Now, the assistant superintendent, was that Maria

14     Pontes?

15     A. It was Maria at the time.  She just assumed --

16     she was just coming on board.

17  Q.  She was also doing double duty as the principal?

18     A. As the principal, yes.

19  Q.  At Kuss?

20     A. Yes.

21  Q.  What did you do?  What direction did you give to

22     your team?

23     A. Well, first I wanted to know who the employee

24     was, and I wanted to get all of the information so

25     that we could look at what exactly was said, and

1     give you the page in a second.  We will go one by

2     one.  Exhibit 15, Pages 90 and 91.

3     A. I have it here.

4  Q.  And, Dr. Malone, do you recall seeing this

5     particular exhibit back in June of 2020?

6     A. Yes, this is an e-mail that we received from, I

7     think Michael Middleton.

8  Q.  And it was received on or about June 5th?

9     A. Yes.

10  Q.  And what does it say on that?

11     A. It says, "Hello."  They sent it to our district

12     account.  "Hello.  I'm writing this because it

13     caught my attention that you have a teacher saying

14     racist things on Facebook, Taryn Camara.  Seeing

15     how she is in charge of our youth and future

16     students, I hope you won't sit around and let this

17     disgusting bigotry linger in your school system.

18     I have attached the posts she has made."

19  Q.  On June 10, 2020, is when you penned a letter to

20     Taryn Camara as a notice of termination?

21     A. Yes.

22  Q.  I want you to go now to Exhibit 16.  Once again,

23     are these some of the postings or screenshots that

24     you saw?

25     A. Yes.

1   Q.   And also Exhibit 20, Pages 119 through 122.

2                    MR. GAGLIARDI:  You know what, I hate

3        to do this, but can I just take a one-minute

4        bathroom break?  I will be right back.

5                    MR. ASSAD:  Sure.

6                    MR. GAGLIARDI:  I'm sorry.

7                    (SHORT RECESS TAKEN)

8                    MR. GAGLIARDI:  Thank you.

9                    ARBITRATOR NEUMEIER:  Okay, we can

10       continue.  Mr. Assad seems to be gone for a moment

11       now.

12                    MR. ASSAD:  Okay, thank you.

13  Q.   Superintendent, I'm going to ask that you look at

14       Exhibit 22, which is Page 128 through 130, and ask

15       what this is?  Can you identify that?

16       A. I believe this is Taryn Camara's Facebook page.

17  Q.   Sorry, I have the wrong page.  This one here,

18       that's the first, Page 128?

19       A. Oh, this is another e-mail from somebody

20       calling out what was posted by Taryn Camara.

21  Q.   And you received that from Maria Pontes?

22       A. Yes, somebody named Kayla Medeiros sent it to

23       her.

24  Q.   And there were some attachments to it also?

25       A. Yes, of screenshots.  They were calling her

1    out.

2    Q.  And if you can look at Exhibit 23, did you receive

3        this?  Can you identify Page 132?

4        A. Yes, I did.  This also came from outside of the

5        district, someone that saw this posting and

6        brought it to our attention, Brianna Gill.

7    Q.  And next would be Exhibit 24, Page 134, if you can

8        identify that for us?

9        A. This was someone named Alice Bloomer, who does

10       not work for us, that also sent us an alert that

11       this was posted, and I responded.

12   Q.  And her statement was what?

13       A. Her statement is, "You have a white supremacist

14       as a teacher."

15                   MR. GAGLIARDI:  Objection.

16       Objection.  This has already been introduced into

17       evidence through Mr. Coogan.  The document speaks

18       for itself.  I mean, do we really need to read the

19       substance of every e-mail?  It's already into

20       evidence.  We're wasting time.

21                   MR. ASSAD:  They're not being

22       introduced into evidence at this time because they

23       all have been preintroduced.  This is for the

24       record to show that the superintendent of schools

25       had this information at the time he sent out the

1          Arbitrator, is the reason why he wrote that

2          response.

3                         ARBITRATOR NEUMEIER:  Yes, I see it.

4          I've read it.  Thank you.

5     Q.   And, Superintendent Malone, is this a standard

6          response you sent to these two individuals?

7          A. Yes, I cut and pasted that to all of the

8          outside e-mails that I received.

9     Q.   And turning to Exhibit 25, which is Pages 137 to

10         138, can you identify what that is, please?

11         A. Yes, this was an e-mail that I sent to the

12         union president of the FREA, the teachers'

13         association, alerting her that we will need a

14         statement from the FREA on this act.

15    Q.   Exhibit 26, Pages 140 to 143.

16         A. Yes.

17    Q.   And you also had received this?

18         A. Yes, this is from Lily McDonald.  This was kind

19         of the crux of most of the complaints, that this

20         is coming from another educator, it's disgusting,

21         and because we service such a large population, a

22         diverse population of students such as these that

23         were disparaged in her e-mail -- I mean, in her

24         Facebook post, that they're questioning our duty

25         to employ somebody.  It's irresponsible but also

1         dangerous.

2    Q.   And you responded to her also?

3         A. Yes.

4    Q.   The standard answer?

5         A. The standard answer.

6    Q.   That there was an ongoing investigation?

7         A. Yes.

8    Q.   Exhibit 27, Pages 145 to 153, if you could take a

9         look at those.

10        A. Yes, so this was us, we're piecing together the

11        thread from Facebook of the commentary.

12   Q.   Exhibit 28, Pages 155 to 157, can you identify

13        that for us, and if you received it?

14        A. Yes, so this was someone identified as Dorian

15        Frenette, community member, also bringing to the

16        attention of the district that Taryn Camara was

17        saying disgusting things on Facebook.

18   Q.   I'm going to direct your attention to Exhibit 30,

19        and ask if you received this, and what you did as

20        a result of it?

21        A. What page?

22   Q.   That's on Page 166.

23        A. So this was on June 8th, an e-mail from the

24        president of the Fall River Educators'

25        Association, I believe to her membership,

1      regarding the incident at Kuss begun by Taryn

2      Camara.

3   Q.  Now, did you have any conversations with Miss

4      Cusick?

5      A. No, other than I alerted her to what was out

6      there to give her a heads-up and say, You need to

7      take a look at this so you're prepared.  That was

8      the extent of my discussion at that time.

9   Q.  And pursuant to this letter, she felt it was a

10      very serious situation; correct?

11      A. Right.  I mean, I think all of us were feeling

12      the ramifications of the heat that was happening

13      not just within, you know, from outside the

14      system, but also all of our teachers were now

15      upset about this conversation.

16   Q.  And looking at Exhibit 32, Pages 170 through 174.

17      A. Yeah.  So the Special Education Advisory

18      Council, which is our parent council for special

19      education students, she was also very upset, and

20      brought this to the attention of our assistant

21      superintendent of special education, Michael

22      Losche, and he brought it to my attention that

23      they were also upset about this.

24   Q.  And who was that that was upset?  Who sent it?

25      A. This was Tiffany Pineault.  She is the

1        president of the Special Education Parent Advisory

2        Council.

3   Q.   How important is that council for the Fall River

4        School Department?

5        A. Very important.  They're the voice, the

6        advocacy voice of our special needs students in

7        the school system.  So they meet monthly.  I meet

8        with them regularly, and they are advocates to

9        ensure that we're doing our mandated

10       responsibilities of educating special needs

11       students.  I just want to add, Miss Camara teaches

12       special needs students, so the advocacy group was

13       very upset.

14  Q.   How many hours did you spend in reviewing this

15       particular investigation?

16       A. I'd probably say I put at least 40 hours into

17       this.  This included time over essentially

18       10 days, roughly four hours a day.  You know, I

19       work 12 to 13 hours a day, so it's not like I

20       worked a half day on it.

21            But on Page 176, we're also starting to hear

22       from students.  So we were hearing from everybody.

23       We looked at all the facts.  We analyzed the time

24       line what was said, how it was said.  I looked at

25       all possibilities to come to a conclusion that

1   Q.   And I'm going to ask if you could refer to

2        Exhibit 1, Pages 17 and 18, and if you could

3        review that for us, please.

4        A. Yes.

5   Q.   And did you receive this prior to issuing the

6        notice of June 10th?

7        A. Yes, this was part of my artifacts of making

8        the decision.

9   Q.   And anything in this particular document strike

10       you?

11       A. Well, it just seems repetitive of the entire

12       investigation up until this point.  That Miss

13       Camara just kept digging more deeply into an abyss

14       without accepting any responsibility.  Instead of

15       saying I said this and apologize, she made

16       statements that other people misinterpreted, it's

17       not her fault, it's everyone else's fault.

18  Q.   And I will direct your attention to Page 18.  In

19       terms of the last couple of sentences from Miss

20       Camara herself, how she felt she affected the

21       School Department.

22       A. Yes, she, in this last sentence, she owns that

23       she's put the district in a negative light, and

24       she's sorry to her colleagues and students and

25       administrators who have been forced to question

1   her integrity.

2   Q.   She also, does she not, in the first full

3        paragraph mention that she's aware that this was

4        widely spread?

5        A. Yes.

6   Q.   In your letter of June 10th, the specific reasons

7        that you gave to Mrs. Camara are enumerated in the

8        exhibits; is that correct?

9        A. Yes.

10  Q.   And all exhibits were forwarded to her?

11       A. We provided her with all the information that

12       we had.

13  Q.   As a result of the letter, did she request a

14       hearing or, scratch that, a meeting in accordance

15       with national laws, Chapter 71, Section 42?

16       A. She did.

17  Q.   And as a result of that, did you conduct that

18       meeting?

19       A. I did.

20  Q.   And could you tell us approximately when that

21       meeting took place and who was present?

22       A. I met -- that meeting took place on June 27,

23       2020.  Present in the room was Taryn Camara.

24       There was an attorney named Leigh Panettiere.

25       There was the president of the FREA, Rebecca

1          Cusick.  There was myself, and I believe Tom

2          Coogan was with me.

3    Q.   Do you remember what transpired during that

4          meeting?

5          A. Yes, we held this meeting, and the meeting

6          began, and I asked for her to provide me any

7          additional information, and her and the attorney

8          chose this same repetitive pattern of simply not

9          owning what was said, and making excuses and

10         blaming other people, and didn't offer me any

11         information beyond what I had that would vindicate

12         her in any way.

13   Q.   At any time during the investigation and the

14         meeting that you had with her and her attorney, at

15         any time did she say that the words, "There is one

16         supreme race and gender and that is the white

17         man," did she ever say they were not her words?

18         A. No, she never said they weren't her words.  She

19         just said they were misinterpreted, which is two

20         different things.

21   Q.   Right.  And just so that we're clear, what type of

22         an opportunity did you give Miss Camara and her

23         counsel to present information to you?

24         A. I gave them the clear path to present any new

25         information and make any sort of statements or

```
 1        comments regarding the behavior that I had called
 2        her in to discuss.  There was no new information
 3        provided, no ownership.
 4   Q.   What would you say the tenure of the meeting was
 5        in terms of, was it cordial?
 6        A. It was professional, it was intense, and I can
 7        say that I definitely speeded up the -- I don't
 8        have time to waste on nonsense.  I wanted to get
 9        to the facts.  They didn't have any facts to
10        provide me, anything beyond, so I questioned do
11        you have any facts to present?  I asked them some
12        questions.  They didn't give me any more
13        information, and then I ended the meeting.
14   Q.   What type of information did they give you that
15        you felt was not pertinent?
16        A. It was all based on this isn't my fault, other
17        people misinterpreted and ran with it, and I'm the
18        victim.
19   Q.   And do you recall how long the meeting lasted?
20        A. Fifteen minutes.
21   Q.   At any point in time did you cut either the
22        attorney or Miss Camara off from making a
23        presentation?
24        A. I believe I asked them to get to the point.
25   Q.   Other than asking them to get to the point, did
```

1       you stop them from presenting information?

2       A. No.

3   Q.  Dr. Malone, I'm going to ask that you take a look

4       at Exhibit 37 on Page 237, and if you can describe

5       what this is and the reason for the publication?

6       A. This was a media statement that was likely the

7       most unique I've sent in five years, because it

8       came from myself and the School Committee, so it

9       was a joint media statement.  I have only done one

10      of these in my five years here, one joint media

11      statement.

12  Q.  And basically what does it say?

13      A. It basically tells the community that it was

14      brought to our attention that we had a teacher who

15      was alleged to say some disgusting, bigoted

16      comments on Facebook, and that we began an

17      investigation, and we placed the employee on paid

18      administrative leave per our SOP, and because it's

19      an ongoing investigation, I cannot comment any

20      further on any specifics, but I did make a

21      statement that we were outraged by what we read,

22      and that the Fall River public schools doesn't

23      tolerate such tone and language in the district.

24  Q.  You stand by that comment; correct?

25      A. I do.  One of the piece that's not here, Bruce,

1     is while we were doing this investigation, we also

2     had several riots here in the city, and riots all

3     across the country on this topic, but Fall River

4     was not immune to the social unrest that was

5     happening across the nation.  I was involved in

6     the protest down the street as an observer to

7     ensure that our students were safe and secure.

8     All of this was heightened by the outcry of why is

9     the Fall River public schools tolerating that type

10    of behavior.

11         So we had to release a statement, but at the

12    same time we had to protect the employee's rights,

13    and we weren't allowed to say anything beyond what

14    was said.

15  Q. Dr. Malone, could you relate to the arbitrator,

16    please, the disruption this caused in the Fall

17    River school district?

18    A. So during the time the school system was

19    closed, and we were operating under remote

20    learning procedures, where we had 10,400 students

21    learning from home, we had over 800 teachers

22    working from their buildings, and we were

23    providing sustainability operations to the entire

24    district.  We distributed 355,000 meals between

25    March 17th and June 30th of that year to families

1      in need.  We also cleaned all of our buildings,

2      provided safety and PPE, as well as ran the

3      business of functionality operations.  Our

4      district never closed.  We were here every single

5      day.

6            So in the midst of that, coupled with the

7      gigantic social unrest across the United States,

8      you can imagine that we were disrupted from what

9      we're here to do by the outcry of what was stated

10     on this Facebook chain.

11           So in terms of how much pressure from the

12     outside we received, it was essentially four

13     levels:  Employees, parents, outside people we

14     don't know, and then students, but all four

15     pointing out the injustice that was stated in the

16     Facebook post.

17           At the same time we were all also engaged in

18     looking at active antiracism and how we have to

19     respond to systemic inequities, systemic barriers

20     to progress, and another part that hasn't been

21     mentioned, besides that one part of the text

22     chain, was all the other structural racism that

23     was inherent in every comment that was made there.

24     Tie all that together, it's ugly, disgusting, and

25     racist, but at the same time it's a mindset that

```
1        if we're working with kids, it's a mindset that
2        would be totally against the core values and
3        beliefs that the system has identified as our
4        central tenants as to why we exist.
5    Q.  Dr. Malone, I would ask you to go back to
6        Exhibit 1, Pages 33 to 36, which is the social
7        media policy.
8        A. Yes.
9    Q.  And the social media policy, if you could just sum
10       that up for us, and also in terms of whether it
11       applies not only for teacher-to-student but also
12       teacher-to-teacher?
13       A. Right, so most of the social media policy is
14       about how students interact on social media.
15   Q.  You've got to slow down, she's taking it down.
16       A. Most of the social media policy that was
17       written in 2020 was written prior to the
18       proliferation of Twitter and Facebook, et cetera.
19       So most of it had to do with students, but there
20       are sections that have to do with adults, and the
21       question is how do we separate someone's private
22       and public life as an educator when dealing with
23       social media.  And it's very clear in our policy
24       that you have the responsibility as an employee to
25       make sure that you're vetting your own comments so
```

1          that you do not direct inappropriate language,

2          hate speech, et cetera, into such posts, because

3          you're a professional, even though you do have a

4          private life, and this was a professional chain, a

5          school-based Facebook chain.  So the policy would

6          go against, or the policy would be at odds with

7          the behavior that was demonstrated.

8     Q.   Sir, with respect to the enrollment data for the

9          Fall River School Department, I'd ask that you

10         look at Exhibit 12, Pages 71 and 72.

11         A. Yes.

12    Q.   Could you tell us, please, the community in Fall

13         River, in terms of the students, what percentage

14         are white?

15         A. As of October 1st of this year, we were

16         48.8 percent white.  In 2019 we became a majority

17         minority school system for the first time.  We've

18         seen a tremendous increase in our second language

19         population and a decrease in our white population

20         dramatically over the last five years in the city.

21    Q.   And I'm going to ask you to take look at Exhibit

22         21, Page 126, and ask you to identify that for us,

23         please.

24         A. Page 126 is a letter that I wrote to Miss

25         Camara on June 5th, in which I placed her on paid

1      administrative leave while we investigated the

2      allegations that were presented to us.

3   Q.  Superintendent, if you could describe, please, for

4      our arbitrator the importance of trust that a

5      parent, faculty, and a student would have in this

6      teacher, the importance of trust?

7   A.  So I have been an urban educator for, I don't

8      know, I've got 28 years in this work.  I've been

9      an urban educator for 23 years of those years, and

10     the work in urban districts between teacher,

11     student, and parent is very different than the

12     work in the suburbs.  Although both focus on

13     content and development, the work in the inner

14     cities, particularly, really has to do with trust

15     in the value of relationships, trust in each

16     other, in order to build a strong relationship so

17     that students can feel free to fail, and adults

18     can feel free to build on skill development

19     necessary to close achievement gaps.

20          So the issue here is that if we do not

21     believe that all kids can learn, particularly

22     students of color, in places where achievement

23     gaps are so wide, then we are essentially

24     depriving the students who we have in front of us

25     from their constitutional right to a free public

1   education.

2        Morally, the issue of trust becomes one of a

3   covenant, if you will, between one's core values

4   and the efficacy of the life of the student that

5   you have in your classroom.  Now, this is a

6   special education classroom.  As you can see from

7   our demographics, we are now majority minority.  I

8   would say to you that when looking at who we are,

9   the actual numbers are slightly jaded as it is

10  self-selection, so we have far fewer white

11  students than we actually have listed on our

12  demographic data because many Portuguese diaspora

13  families who look nonwhite sub-select and identify

14  as white in the forms that we submit.  So we have

15  a large percentage of nonwhite students who are

16  already up against the wall, are not achieving at

17  the rates that they need to be, and then we have

18  adults believing that these kids can't because

19  they're inferior.  So if you play that out,

20  students will never have success if you don't

21  believe in them.

22        So the issue of trust is key and critical.

23  So when you have an adult that breaks that

24  covenant, that bond with kids, kids have already

25  most likely given up and said that teacher doesn't

```
 1        believe in me, I'm not doing any work anyway, and
 2        it perpetuates this self-fulfilling prophecy of
 3        failure.  The pipeline from school to prison, if
 4        you will; the pipeline of school to social health
 5        agencies; the pipeline to welfare and poverty.
 6            So what we look for when we're working with
 7        adults is to really build belief systems around
 8        individual efficacy and effort being the key,
 9        through believing that kids can.  No matter who
10        they are, if we believe in equity, some kids need
11        more than others, but all kids can.  That is
12        really where the trust factor breaks down,
13        particularly in inner cities.
14            So this being out there, this is
15        essentially -- I mean, the decision to write this
16        prohibits this person, Miss Camara, from ever
17        working in a public education system ever again,
18        and that's the reality, is that nobody will be
19        able to rebuild and repair the sense of trust and
20        loss that was created because of these comments,
21        with really, at the end of the day, no apology and
22        just excuses, and to me that's the great travesty
23        in this entire case.
24   Q.   Dr. Malone, I'm going to ask that you look at
25        Exhibit 1 again, Pages 45 and 46.
```

1          ARBITRATOR NEUMEIER:  What were those

2    numbers?

3               MR. ASSAD:  45 and 46.

4    A. Okay.

5    Q.  Do you recognize that document?

6    A. Yes, this is the notice of termination on

7    July 1st.

8    Q.  And, sir, I know you've expressed the reasons why

9    you terminated her, but can you summarize them

10   based on the letter you wrote to her --

11   A. Yes.

12   Q.  -- as to the reasons for your decision --

13   A. Yes.

14   Q.  -- to terminate Taryn Camara?

15   A. So, "The making and posting of racist and

16   bigoted statements on the social media platform

17   Facebook constituted unprofessional conduct and

18   substantively impaired your ability to command the

19   confidence of students, faculty, parents, and the

20   community to continue to perform as a teacher.

21   Specifically, your actions attracted considerable

22   negative attention from parents and the public at

23   large.  Such conduct has had a disruptive effect

24   on the learning environment and arose

25   the requisite..."

1           MR. GAGLIARDI:  I'm just going to

2     object.  This is already into evidence.  Why is he

3     reading the entire letter into the record?

4           MR. ASSAD:  He's not reading the

5     entire letter.  He's giving his reasons pursuant

6     to the letter, Madam Arbitrator, and I suggest

7     that we allow him to do so.

8           MR. GAGLIARDI:  I object to reading

9     the letter into the record.  If Mr. Assad wants to

10    ask him questions what he meant by this paragraph,

11    that's fine, but we're running out of time here.

12          ARBITRATOR NEUMEIER:  You don't need

13    to read the whole thing.  If you could just

14    explain, perhaps, the letter.  Thank you.

15    A. Well, I just read it, and Miss Poore wrote it

16    down, so I will reiterate that what I said was

17    that her actions totally deconstructed any hope of

18    her ever engaging with students again, because

19    families don't trust her, employees don't trust

20    her, and students don't trust her.  She nullified

21    her ability to engage in a public act of

22    education.

23          MR. ASSAD:  I'm going to ask for a

24    10-minute recess, please.

25          MR. GAGLIARDI:  Jane, could you just

1    Q.   And during that meeting, did you request any
2         further information that she may have that would
3         alter the decision that you had made in early
4         June, that based on the statements you were going
5         to be terminating her?
6         A.  Yes.
7    Q.   And on how many occasions did you ask for that new
8         information?
9         A.  Several times.
10   Q.   Was any information provided to you?
11        A.  No.
12   Q.   It's been mentioned several times about why did
13        you terminate Mrs. Camara.   Could you just relate
14        one more time, please, what were the reasons for
15        her termination?
16        A.  I terminated Taryn Camara for conduct
17        unbecoming for promulgating racist commentary that
18        was disruptive to the good order and core beliefs
19        of the school system.
20                         MR. ASSAD:   I have no further
21        questions.
22                         ARBITRATOR NEUMEIER:   Any further
23        cross?
24                         MR. GAGLIARDI:   No.
25                         ARBITRATOR NEUMEIER:   Okay, thank you