# In The Matter Of:

*Arbitration*

*Camara and Fall River Public Schools - Day 4*

*June 11, 2021*



```
1              AMERICAN ARBITRATION ASSOCIATION

2


3       PROCEEDINGS IN RE VIA VIDEOCONFERENCE:

4       CASE NUMBER:  01-20-0014-5686

5       TARYN CAMARA

6       -and-

7       FALL RIVER PUBLIC SCHOOLS

8       GRIEVANCE:  MASSACHUSETTS GENERAL LAW CHAPTER 71
                    SECTION 42 -- DISMISSAL
9


10      DAY 4

11                              JUNE 11, 2021
                                9:00 A.M.
12


13

14      BEFORE VIA VIDEOCONFERENCE:

15      ARBITRATOR ELIZABETH NEUMEIER


16      APPEARANCES VIA VIDEOCONFERENCE:

17      FOR THE PETITIONER:
        LAW OFFICE OF MARK P. GAGLIARDI
18      BY:  MARK P. GAGLIARDI, ESQUIRE

19      FOR THE RESPONDENT:
        LAW OFFICE OF BRUCE A. ASSAD
20      BY:  BRUCE A. ASSAD, ESQUIRE


21

22      ALSO PRESENT VIA VIDEOCONFERENCE:  TARYN CAMARA,
        THOMAS COOGAN, SHERI DiPRETE

23

24

25
```

```
 1                      I N D E X

 2    WITNESS                                      PAGE

 3    TARYN CAMARA
           DIRECT EXAMINATION BY MR. GAGLIARDI      589
 4    MATTHEW MALONE
           CONTINUED CROSS-EXAMINATION BY MR.       676
 5         GAGLIARDI
           REDIRECT EXAMINATION BY MR. ASSAD        725
 6    TAYRN CAMARA
           CROSS-EXAMINATION BY MR. ASSAD           727
 7

 8

 9                    E X H I B I T S

10    NO.                   DESCRIPTION             PAGE

11              PETITIONER'S EXHIBITS

12               MARKED IN FULL

13    EXHIBIT D    TARYN CAMARA'S LETTER TO FALL RIVER   669
                   SCHOOL DISTRICT EE45-EE47
14
      EXHIBIT J    FACEBOOK POSTS BATES LABELED EE74 TO  600
15                 EE94

16

17    REPORTER'S NOTE:   ALL PARTIES HAVE THEIR OWN COPY OF
                          EXHIBITS
18

19

20

21

22

23

24

25
```

1    Q.   Under what circumstance would you typically add

2         new Facebook friends?

3         A. Typically if I received a friend request from

4         someone, you know, I would make that determination

5         by accepting them or not.  Facebook has a way of

6         letting you know, you know, that there are certain

7         people, and, you know, I mean, but I never

8         friended anyone unless I knew them well.

9    Q.   Okay.  Did you have -- in June of 2020, were you

10        Facebook friends with any of your students?

11        A. No.

12   Q.   Were you ever Facebook friends with any of your

13        students since you've been on Facebook?

14        A. No.

15   Q.   In June of 2020, were you Facebook friends with

16        any parents of your students?

17        A. No.

18   Q.   Had you ever been Facebook friends with any

19        parents of your students?

20        A. No.

21   Q.   What about co-workers, in June of 2020, were you

22        Facebook friends with any of your co-workers?

23        A. Yes.

24   Q.   Can you name them?

25        A. All of them?

1   Q.   Approximately how many?

2        A. I had worked with them for a long time, so I

3        would say as many as 20.

4   Q.   And what is your regular practice for making posts

5        on your Facebook page?

6        A. When you say "practice," what do you mean?

7   Q.   How did you go about -- what method did you use to

8        make a Facebook post?  I want to talk to you about

9        making a Facebook post on your own page versus

10       making a comment.

11       A. Oh.  Generally, if I was sharing a picture, you

12       know, I would make a comment, but I would always

13       type those.  If I shared something and made a

14       comment, I would always type those.

15  Q.   And how did you log on -- how did you use

16       Facebook?  Did you use it on a laptop, desktop?

17       A. Most times my Facebook usage was through my

18       phone.

19  Q.   And did you access a web browser, or was it

20       through an application?

21       A. It was an app.

22  Q.   The Facebook app; yes?

23       A. Facebook app, yes.

24  Q.   And what about -- so you testified that when you

25       would make a post on your own Facebook page, you

1          A. My Facebook page.

2     Q.   Who's Lopez Taz?

3          A. That's my now Facebook name.

4     Q.   And what was the previous name you used?

5          A. Taryn Lopes Camara.

6     Q.   Why did you change it?

7          A. I changed it after the firestorm of June 5th.

8          I changed it on June 7th.

9     Q.   Why?

10         A. At that time I was under, you know, a lot of

11         tumultuous comments, people reaching out to me,

12         looking up my name, and at that time I wanted to

13         delete my whole account, but I felt that, you

14         know, there could be some important evidence

15         within my Facebook, so I didn't want to delete it

16         completely.  So I changed my name.  I deleted all

17         my friends, family, just kept maybe about four or

18         five, and just kept my Facebook alive as

19         protection.

20    Q.   Did you personally make all these Facebook posts

21         and comments that are contained in Exhibit J that

22         fall under the name Lopez Taz?

23         A. Yes.

24    Q.   Have you deleted any of these posts or comments in

25         Exhibit J in any way since they were originally

```
 1        A. I typed it in.
 2   Q.   And Facebook Post Number 5, how did you enter that
 3        information there?
 4        A. As I do all posts, I typed it.
 5   Q.   And Facebook Post Number 6, why did you share this
 6        post?
 7        A. I shared it because I felt that there was a lot
 8        of unrest, and Candace Owens was someone that
 9        had -- she's a black woman, and I thought as
10        though her views were important to hear, as
11        another way of looking at how we can help the
12        black community and the injustices that are
13        happening to them.
14   Q.   What did you take from her video?  What was the
15        primary -- in your opinion, what was her primary
16        theme to her video?
17        A. Her theme was that black America is in trouble,
18        and there are numerous things that are problems.
19        That, yes, there's racial profiling, and all these
20        things, and there are problems with police
21        brutality, but that in itself, if we concentrate
22        on just that in itself, we're going to miss the
23        other problems that are affecting that community.
24   Q.   Like what?
25        A. The breakdown of family, absent the father,
```

1       poverty.

2    Q.  And that's the message that you wanted to share

3        with this post; yes?

4        A. I wanted to share her message, yes.

5    Q.  Why did you write, "These are the words of someone

6        who has the right to speak"?

7        A. Because she's a black person, and I felt that

8        there was a lot being said, and we needed to

9        listen to everyone, but firsthand accounts of

10       what's going on, conservative, liberal, or in

11       between, it was best heard from someone who had

12       walked that walk.

13   Q.  And when did you make this post?

14       A. June 5, 2020.

15   Q.  Approximately what time?

16       A. 9:16 A.M.

17   Q.  How do you know you made it at 9:16 A.M.?

18       A. Because I went back, and there was a lot of

19       discussion in the last three about time frame, so

20       I wanted to be prepared if I was asked when I had

21       posted this, and it was posted at 9:16 A.M.

22   Q.  Is this post still on your Facebook page?

23       A. Yes.

24   Q.  And you went to your Facebook page, back to June

25       5th, 2020, and you learned it was made at

1        community!" What did you mean when you wrote,

2        "There is a lot wrong with what is happening to

3        the black community"?

4        A. Exactly that.  You know, yes, there's police

5        brutality, but there's also father absence,

6        breakdown of family, poverty.

7    Q.  Is it fair to say you're sort of reaffirming what

8        you interpreted the video to be?

9        A. Yes.

10   Q.  Is this comment here on Page 88, is that contained

11       in the Exhibit I?

12       A. No.

13   Q.  Do you know why?

14       A. No.

15   Q.  Bottom of Page 88 you write, "And oppression will

16       continue with that narrative -- guess we will

17       agree to disagree my friend and Candace Owens is

18       far from a white supremacist."  Is that comment

19       contained in Exhibit I?

20       A. Yes.

21   Q.  You write on Page 89, "Again agree to disagree.

22       The narrative to make one race less than another

23       continues I guess."  Is that comment in Exhibit I?

24                    ARBITRATOR NEUMEIER:  Excuse me, you

25       said Page 89 on Exhibit J?

1        A. Facebook Post 7.

2    Q.  Okay.

3        A. 92.

4    Q.  Where?

5        A. The post that is Facebook 7, I have, "Black

6        Lives Matter?  Their lives are getting little

7        attention!"

8    Q.  Let's go back to -- all right, what did you do

9        after you made -- I'm sorry, and then the second

10       part you write, "Lastly if you look at the stats

11       more black men have died from other black men than

12       white men -- so there lies two problems!"  What

13       message did you intend to convey with that

14       sentence?

15       A. I was stating the stats that Candace Owens

16       referred to in her video, and as she said, I was

17       reiterating the fact that, you know, what's

18       happening with a cop who now has killed a black

19       man, that in itself is a problem, but we have

20       to -- to help the black community -- we also have

21       to look at the fact that the black-on-black crime

22       is what's killing a lot of black, and we need to

23       educate them so that their community isn't losing

24       fathers, and that's where the breakdown of family

25       is happening.

1       page, you saw the screenshot, and you physically

2       saw Kristin McDonald's profile in the lower

3       left-hand corner?

4       A. Not on that day, no.

5   Q.  What day did you see it?

6       A. I noticed that there was a profile pic when it

7       hit the newspaper on the 8th.

8   Q.  You're not suggesting that Kristin McDonald sent

9       this to Mike Suplee, are you?

10      A. Yes, I am.

11  Q.  You are?  How do you know that?

12      A. I know that because he got this through someone

13      that knew me, and the proof is that there's a

14      profile pic there, and when I later realized it,

15      and went through my friends and their profile

16      pics, that was her profile pic at the time.

17                  MR. ASSAD:  Objection.  What is the

18      relevance, and where are we going with this?

19                  MR. GAGLIARDI:  It's all part of the

20      big picture.  I mean, relevance is a low standard.

21                  MR. ASSAD:  What is the relevance of

22      how it got out?  Everyone knows that once you put

23      something on the internet and Facebook or social

24      media, it can become very public very fast, and

25      it's not limited to who your friends are.

1       A. She told me, you know, you're just going to go

2       in, and you're going to just give your statement,

3       and they're going to hear it, and, you know, it

4       will go to the superintendent, and he will then

5       talk with you.  I thought I was -- you know, it

6       was just kind of like giving more information and

7       context to help him respond to the media, since at

8       that point it had grown more and more since Friday

9       night.

10  Q.  Did you have the opinion, or did you have the

11      feeling that your job was in jeopardy at that

12      point?

13      A. No.

14  Q.  Why not?

15      A. I didn't feel that way because, in all honesty,

16      I had the conversation with them, and there didn't

17      seem to be any indication that that was something

18      I needed to prepare myself for.  Actually, on

19      Sunday night is when I lost opportunity to use

20      e-mail, but I was told I lost opportunity because

21      this frenzy of sharing, someone had now started

22      contacting, like, teachers, and they didn't want

23      to put me at any risk, you know, to get e-mails

24      that would be threatening.  So that's why I

25      believed my e-mail was stopped.  My X2 account had

1         part of the parity.

2    Q.   And to be fair, she had the hand over her hair,

3         like the Hitler hair, and you had the Hitler

4         salute; right?

5         A. Right.

6    Q.   I'm just going to fast-forward this.  And why did

7         you write this over here (indicating)?

8         A. Because Annie refers to him as Stove instead of

9         Steve.  Those are just words she used.

10   Q.   And why did you write that?

11        A. Because she refers to him as an appliance.

12   Q.   Just a few final questions for Mrs. Camara.

13        Taryn, are you a racist?

14        A. No.

15   Q.   Are you a white supremacist?

16        A. No.

17   Q.   Have you ever expressed any racist opinions on

18        your Facebook page?

19        A. No.

20   Q.   Ever expressed racist opinions on anyone else's

21        Facebook page?

22        A. No.

23   Q.   Have you ever discriminated against or made racist

24        comments to any minority students?

25        A. No.

1    that we're five minutes away from noon, and we

2    said we would be calling the superintendent at

3    that time, so take your five-minute break, and

4    we'll reconvene; okay?

5               MR. GAGLIARDI:  Okay, thanks.

6               (SHORT RECESS TAKEN)

7               ARBITRATOR NEUMEIER:  Let's finish

8    direct, and then take a break, and we'll move as

9    quickly as possible.  Everybody stay very focused

10   on your questions.  Go ahead.

11   Q.  Taryn, just one final question, why did you have

12   your fingers over your -- one hand over your lip

13   and your left hand up like that?

14   A. Because Annie does that in the movie.  She kind

15   of goes like this, but my friend snapped the

16   picture when I was already in this pose.

17   Q.  Were you intending to make any racist or

18   anti-Semitic expressions with this post?

19   A. No.  It was all a parity, all related to the

20   movie.

21               MR. GAGLIARDI:  No further questions.

22   Thank you.

23               ARBITRATOR NEUMEIER:  Okay, thank

24   you.  So it's, I have 12:09.  Can we start

25   promptly at 12:30?

1           A.  I spoke those words.

2      Q.   You spoke -- well, okay, you spoke those words,

3           and you hit send; right?

4           A. Yeah.

5      Q.   On your phone you did that; right?

6           A. Yes.

7      Q.   And you know that you're responsible for what you

8           put on the internet; correct?

9           A. Yes.

10     Q.   And responsible for what you put on Facebook;

11          correct?

12          A. Yes.

13     Q.   You would agree with me, would you not, Mrs.

14          Camara, that the words, "There is one supreme race

15          and gender and that is the white man," is a racist

16          statement?

17          A. Yes.

18     Q.   And you would agree that the phrase, "There is one

19          supreme race and gender and that is the white

20          man," is a white supremacist statement?

21          A. I don't really understand the whole white

22          supremacist, so no.

23     Q.   But you believe it was a racist statement?

24          A. Yes.

25     Q.   And you would agree with me that basically the

1      quote went viral; correct?

2      A. Yes.

3  Q.  And that it damaged your reputation; correct?

4      A. Yes.

5  Q.  And it damaged the school district's reputation,

6      the Fall River school district's reputation;

7      correct?

8      A. No.

9  Q.  No?  You really don't think so?

10      A. No.

11  Q.  So you --

12      A. I think there's a lot more.

13  Q.  Say that again.

14      A. I think there's a lot more that's damaging Fall

15      River right now.  It wasn't that.

16  Q.  Let's talk about you; okay?  Let's talk about you.

17      A. Okay.

18  Q.  Let's talk about you making a racist statement on

19      Facebook that went viral.  You don't believe that

20      that had any effect on the Fall River school

21      district; is that what you're saying?

22      A. Initially, yes.

23  Q.  Initially what yes?

24      A. Initially it had an impact on all of us.

25  Q.  I'd ask you to turn to Exhibit 1, Pages 17 and 18.

1    Q.   Mrs. Camara, isn't it fair to expect that after

2         reading that statement, that racist comment, that

3         students would believe that you may be a racist?

4         A. No.

5    Q.   You don't think that's possible?

6         A. No, because I'm not, and that wasn't my intent.

7    Q.   That's not my question.  That's not my question.

8         I'm not accusing you of being a racist in this

9         question.  I'm only asking that, is it fair to

10        expect that students who read that particular

11        quote would believe that you're a racist?

12                    MR. GAGLIARDI:  You can answer.

13        A. No.

14   Q.   No, okay.  Is it fair to expect that after reading

15        that quote, that statement, that students,

16        especially students of color, would be reluctant

17        to share their concerns with you?

18        A. I would have to build that trust for any

19        student that I would have got in September of

20        2020, and I would have had to rebuild that, if

21        necessary, but my reputation with my students that

22        saw that would not have questioned it, because

23        they knew how I was with them.

24   Q.   So new students that were coming in, who didn't

25        know you, okay, you would agree with me that they

1        may be reluctant to come to you with their

2        concerns?

3        A. If they had concerns, I would have to rebuild

4        the trust and explain the dangers of using

5        voice-to-speech, and your sarcasm does not come

6        through.  So as an English teacher, I would use it

7        as a teachable moment to say tone is everything.

8        And in my attempt to use sarcasm, my tone went

9        unnoticed, and when that happens, you can be

10       accused of something that could ruin your life.

11       So be careful is what I would say, be careful with

12       tone.  I would use it as a teachable moment.

13    Q.  A teachable moment.  Would you need it to be a

14       teachable moment because they would probably be

15       reluctant to go to you with their concerns?

16       A. I was not the sole teacher in the room, and --

17    Q.  There would be a concern --

18                (INSTRUCTED TO SPEAK ONE AT A TIME)

19    Q.  The fact that you would use it as a teachable

20       moment is because there would be a concern by the

21       students as to whether or not you would be fair

22       with them; correct?

23       A. You're giving me not a situation that happened.

24       You're asking me --

25    Q.  I'm just asking yes or no.

1        MR. ASSAD:  Madam Arbitrator, I'm

2   asking a yes or no question.  I'm not asking for

3   narratives.  Please, I'd ask she just answer the

4   question.  If she doesn't believe it, that they

5   would be concerned about going to her, and her

6   being fair, she can say that, but I'm just asking

7   for a yes or no answer.

8        MR. GAGLIARDI:  I'm going to object

9   on the grounds that she can't get in the minds of

10  how kids would react.  You're asking her to form

11  an opinion on someone else's subjective feelings.

12       MR. ASSAD:  I'm asking her is it fair

13  to expect that someone would feel that she may not

14  be fair with them, especially if they were a

15  person of color.

16  A. Yes.

17       MR. ASSAD:  That's all.

18  Q.  Yes?

19  A. Yes.

20       ARBITRATOR NEUMEIER:  "Yes."  Thank

21  you.

22  Q.  Is it fair to expect that a parent who read your

23  quote would be concerned about their child being

24  in your classroom?

25  A. Yes.

1    Q.   I'm going to ask, Mrs. Camara, if you can turn to

2         Page 23 -- 33, rather.

3         A. What am I looking at now?

4    Q.   You're looking at the social networking policy for

5         the Fall River public schools.

6         A. Yes.

7                   MR. GAGLIARDI:  Do you want me to

8         share it on the screen?

9                   THE WITNESS:  Yes.

10                  MR. GAGLIARDI:  Is it okay?

11                  THE WITNESS:  Yes.

12   Q.   You're aware of the fact that the School

13        Department has a policy on social networking?

14        A. Yes.

15   Q.   Okay.  I can't see you.

16        A. I can see it.

17                  MR. GAGLIARDI:  Can you see her now?

18                  ARBITRATOR NEUMEIER:  She needs to

19        speak.

20   Q.   Mrs. Camara, do you need that on the screen?

21        A. I see it, and I said, yes, I see it.

22                  MR. GAGLIARDI:  Do you need it on the

23        screen, Taryn?  Do you have it in front of you?

24                  THE WITNESS:  I do.  I do not have it

25        in front of me, no.

1    Q.   I'm going to ask you to turn to Page 34.   It's the

2         second page in that document.

3         A.  Yes.

4    Q.   And Number 1, could you read out loud the last

5         sentence in Number 1?

6         A.  "You will be responsible should any information

7         you intended to be private becomes public due to

8         your own ignorance of the features of the social

9         network you have decided to use, or your

10        failure..."   It just moved.   It moved.

11   Q.   I'm sorry.   Did you finish?

12        A.  "...due to your own ignorance of the features

13        of the social network you have decided to use, or

14        your failure to properly use such features."

15   Q.   You understood that; correct?

16        A.  Yes.

17   Q.   And Number 2, the first sentence, please?

18        A.  "You must also..."   It moved again.   "You must

19        also know that any information you share privately

20        with a recipient could be redistributed by such

21        recipient, without your knowledge or consent."

22   Q.   And the last sentence in Number 2?

23        A.  "In essence, nothing you post online is ever

24        truly private."

25   Q.   And you recognize that; correct?

```
 1         A. Yes.
 2    Q.   And you would agree with me, Mrs. Camara, that on
 3         a yearly basis, especially at Kuss with Maria
 4         Pontes as your principal, that every year at the
 5         start of the year during orientation she talks
 6         about being careful what you put online?
 7         A. Yes, be careful.
 8    Q.   I'm sorry, I didn't hear you?
 9         A. She says anything that you put in print, be
10         careful.
11    Q.   She mentioned about on online and social media,
12         too; correct?
13         A. Yes.
14    Q.   During the orientation every year; is that right?
15              ARBITRATOR NEUMEIER:   You need to
16         answer.
17         A. Yes.
18    Q.   And is it the Mass. Teachers' Association in
19         conjunction with the Fall River Educators'
20         Association that have seminars at the beginning of
21         each year available for teachers concerning social
22         media?
23         A. I did not know of that.
24    Q.   You don't know?
25         A. No.
```

1        a staff member, may expose an employee to

2        discipline up to and including discharge."

3   Q.   Read the next -- not the next sentence, but the

4        sentence after that that begins, "If your

5        behavior..."

6   A.   "If your behavior is inappropriate, undermines

7        your authority to instruct or maintain control and

8        discipline with students, compromises your

9        objectivity, or harms students, the School

10       District reserves the right to impose discipline

11       for such behavior."

12  Q.   And you're aware of that policy; correct?

13  A.   Yes.

14  Q.   And as a matter of fact, you signed a receipt

15       indicating that you received that policy; is that

16       not true?

17  A.   I think in 2012, yes.

18  Q.   Okay.  Would you agree with me, Mrs. Camara, that

19       anyone who would promulgate or postulize that

20       white men is a supreme race -- white men are the

21       supreme race and gender probably should not be a

22       teacher?

23  A.   If that's what they believed.

24  Q.   A statement such as that, the person probably

25       should not be a teacher; correct?

1      A. Again, I'd have to know the intent of what they

2      meant by that.

3   Q.   Now, many people --

4      A. You want me to infer that that's racist and

5      white supremacist.

6              MR. GAGLIARDI:  Listen to the

7      question.  He said if they believe that, right?

8      A. If they believed it to be racist, and they

9      meant it to be racist, then they should not be

10     teaching, correct.

11  Q.   Mrs. Camara, anyone who does not know you, who

12     read that statement, wouldn't you agree with me

13     that they would have a right to expect that that

14     was a racist comment made by somebody who had

15     racist beliefs?

16     A. I believe they had the right to question me and

17     to have doubt until they meet me, yes, but then

18     it's my job to explain otherwise, and I had a

19     reputation of 22 years.

20  Q.   Okay, all right.

21     A. Good relationships.

22  Q.   My question is:  Is it reasonable to believe that

23     someone would believe that making that statement

24     would be a racist statement, and that the person

25     making that statement would be a racist?

1          A. That didn't know me?

2     Q.   Correct.

3          A. Yes.

4                    MR. GAGLIARDI:   I'm just going to

5          object to "that statement."   What statement are

6          you talking about?

7                    MR. ASSAD:   The statement that there

8          is one supreme race and gender and that is the

9          white man.   The statement you have in Number 3 in

10         yours and on Page 9 in Exhibit 1.   If you want, I

11         can read it to you again.

12         A. No.   I said that if they didn't know me, it is

13         fair to say they would question whether or not I

14         was a racist.

15    Q.   So the people that received -- you mentioned that

16         this was so widespread that you can't even count,

17         and agree that it went viral.   How about all those

18         individuals who don't know you, who read this,

19         what do they have a right to believe?

20                    MR. GAGLIARDI:   Objection.   She can't

21         testify to that.

22                    ARBITRATOR NEUMEIER:   I think she

23         can, actually.   Go ahead, answer the question.

24         A. I think they have a right to believe what was

25         there in print, and their interpretation of it.

1       That's their right.

2 Q.  And you would agree with me that it's a fair

3       interpretation that that statement is racist;

4       correct?  I think you've already testified to it,

5       but you can change your mind if you want.

6       A. They are going to interpret that because they

7       don't know my intent.  If they know --

8 Q.  No, no, I'm not asking about your intent.

9               MR. ASSAD:  My objection, Madam

10      Arbitrator, is that I'm not asking about her

11      intent.  I'm asking about the words themselves.

12               MR. GAGLIARDI:  I'm going to object.

13      The superintendent fired her.  These people

14      complained.  Whether or not they had a right to do

15      that is irrelevant.  It is what it is.  It's on

16      the record they complained, and the superintendent

17      did what he did.

18               MR. ASSAD:  You know something,

19      that's not the tenor of the question, and I'd

20      appreciate it, Madam Arbitrator, if I'm allowed to

21      get an answer to the question about those words.

22      It's not unreasonable, and, as a matter of fact,

23      it could very well be expected that somebody who

24      read those words would think it's a racist

25      comment.

1      should that person be a teacher?

2      A. It depends.  It depends on what their intent

3      was in saying that.  I mean --

4                      ARBITRATOR NEUMEIER:  The question is

5      not saying that.  The question is --

6                      THE WITNESS:  Believes it?

7                      ARBITRATOR NEUMEIER:  The word in the

8      question is if the person believes that, not that

9      they said them.

10     A. If the person believes that --

11                     ARBITRATOR NEUMEIER:  That's right.

12     A. -- then they're saying that there's only one

13     supreme being, and that's -- you would never be

14     able to really teach because not one person is the

15     same, so no.

16  Q.  Is it fair to say, Mrs. Camara, that anyone who

17      read those words would assume that the person who

18      wrote it was a racist?

19      A. No.

20  Q.  People who don't know you, who read those words,

21      would you agree with me that they would have a

22      right to believe that you were a racist?

23      A. They would have a right to question me, yes.

24  Q.  That you are a racist; correct?

25      A. They would have a right to question me, and to

1       find out if I was, yes.  They would have reason to

2       possibly question that, somebody that doesn't know

3       me.

4   Q.  So you would at least agree that it would cause a

5       concern to individuals who read that statement?

6       A. I think it would be a concern for me more than

7       the individuals that were judging me.

8                   MR. ASSAD:  I'm sorry, Madam, I

9       didn't catch all she said.

10      A. I said that I think it has more to do with me

11      than judging me.  I mean, that's a judgment that

12      they're making on words that they don't understand

13      or know the context to.

14  Q.  So it's their fault?

15      A. There's a lot of faults here.

16  Q.  So it's their fault?

17      A. I don't know what you're getting at.  I'm not

18      pointing fingers at anyone.  The only one that is

19      being accused of being racist is me, and I'm not,

20      and I'm not going to own that, nor am I going to

21      say that that's what I am, because I'm not.

22  Q.  I didn't say that you were a racist, ma'am.

23      A. Well, indirectly you are because you're saying

24      that people who don't know me are questioning

25      whether or not I am.  They're making an assumption

```
 1        that I am, and I have to own that.  No, I can't
 2        own what other people think.  I can only own what
 3        I am.
 4                     MR. ASSAD:  No.
 5        A.  But I am not what they said I was --
 6                     MR. ASSAD:  That's not what I asked.
 7        A.  -- or what they inferred I was.  That is the
 8        question.  The question is not a yes or no.
 9                     MR. ASSAD:  Madam Arbitrator, I ask
10        that be stricken.  That's not an answer to the
11        question.
12                     ARBITRATOR NEUMEIER:  Let's go back
13        to the question again.
14                     (QUESTION READ BACK)
15                     ARBITRATOR NEUMEIER:  So the question
16        is:  Would it cause a concern to people who read
17        that statement?
18        A.  It depends on who the people are.  He said
19        people that don't know me.  I would think it would
20        be more of a concern for people who knew me,
21        because they know my character.  Someone who
22        doesn't know me, I mean, in all honesty, needs to
23        get to know me to understand the context and the
24        meaning behind it.  So, hypothetically, yes, these
25        random people that were out there sharing this
```

1        depending on how they're treated, and it would be

2        my job to show them that I am fair and just, which

3        I've always been.

4    Q.  Let me try to do it a different way.  It's a

5        simple question.  Students in a new year, that you

6        don't know, and they don't know you, okay, we'll

7        start with that, read this statement, and the only

8        statement they read was that one, "There is one

9        supreme race and gender and that is the white

10       man."  A child of color coming into your

11       classroom, wouldn't you agree with me that they

12       would have a right to question whether or not you

13       would be fair with them?

14       A. Do they have the right to question?  A student

15       has a right to question anything.

16   Q.  Ma'am, you know what the question is that I'm

17       asking you.

18       A. Yes, I do, and I'm trying to answer it, but you

19       want me to answer it one way, and I can't.

20   Q.  Answer the question, please, and the court report

21       can read it back.  It's a very simple question.

22       It's a yes or no answer.

23                    (QUESTION READ BACK)

24       A. They would have a right to question that,

25       absolutely.

1            ARBITRATOR NEUMEIER:  Okay, so the

2       answer is yes, absolutely.

3   Q.   You understand, do you not, that based on that

4       comment of one supreme race and gender and that is

5       the white man, that colleagues at work would have

6       a reluctance to work with you?

7       A. Colleagues that I worked with knew me.

8   Q.   How about if they didn't know you?

9       A. Then I would have to explain if they had any

10      questions.

11  Q.   So you would agree with me that they would have a

12      right to question you, and there would be a

13      reluctance for them to work with you?

14      A. That I don't know.  There's no way I would know

15      that.

16  Q.   Mrs. Camara, you can understand why a School

17      Department cannot have a teacher who is a racist

18      or bigot on their staff at any time; correct?

19      A. Yes.

20  Q.   And you would agree with me that it is critical,

21      it's very important, for a school system and a

22      city to demonstrate that race and bigotry have no

23      safe haven and must be rooted out wherever it

24      appears?  You would agree with that; right?

25      A. No.

1   Q.   No?   Maybe it was a bad question.   Let me try to

2        break it up a little bit.   I think you would agree

3        with this:   That it's critical for a School

4        Department in the city to demonstrate that race

5        and bigotry cannot exist in their community?

6        A. Obviously, yes.

7   Q.   If you weren't involved in this particular case,

8        Ma'am, and you read that statement, that

9        statement, "There is one supreme race and gender

10       and that is the white man," which I think we can

11       all agree is a blatantly racist remark, you would

12       not want that teacher associated with your school

13       system; correct?

14              MR. GAGLIARDI:   I'm just going to

15       object, Madam Arbitrator.   He's misstating the

16       statement.   That's not the statement.   It's one

17       sentence separated by a hyphen.   So it's

18       inherently unfair to say if somebody reads this

19       one statement they're going to have an opinion.

20       There's more to it.   This is unfair.   It's

21       misleading.

22              MR. ASSAD:   Madam Arbitrator, it is

23       my question, it is cross-examination, and these

24       are the words that went viral.   I have every right

25       to ask that of Mrs. Camara.